JUDGE COFER
delivered the opinion of the court.
In the summer and autumn of 1874 certain differences arose between the pastor, the Rev. S. R. Wilson, D. D., and seven of the ten ruling elders of the First Presbyterian Church in the city of Louisville, which were carried into the Presbytery of Louisville, of which the First Church was a constituent, and thence into the General Assembly of the Presbyterian Church in the United States, and finally resulted in the permanent disruption and division, into two unfriendly bodies, of a large and influential congregation which had theretofore dwelt together in unity and worshiped God in harmony around a common altar.
The formation of these rival organizations, each claiming to be the true First Presbyterian Church of Louisville, led to *256 the bringing of this suit to test their respective claims to the property which had belonged to them as a united whole.
The pleadings, evidence, and briefs of counsel have, as is unfortunately too often the case in church controversies, taken a very wide range, and the legal issues in the cause, of which alone the secular courts have cognizance, are not a little obscured by a multitude of irrelevant personal and ecclesiastical questions with which we have neither the right nor the inclination to interfere.
Religious societies are regarded by the civil authority as other voluntary associations, the individual members and separate bodies of which will be held to be bound by the laws, usages, customs, and principles, which are accepted among them, upon the assumption that in becoming parts of such organisms they assented to be bound by those laws, usages, and customs, as so many stipulations of a contract between them.
It.is only by so regarding the association of individuals or bodies for religious purposes that the civil authority in this country can interfere at all, and then it can interfere only so far as may be necessary to decide upon and protect rights of property depending upon the contract between the parties. And when that contract has been construed by the parties the courts will, as in other cases, follow their own construction.
With the merits of the unfortunate and acrimonious differences between the Rev. Dr. Wilson and those adhering to him on the one side, and the seven elders and those adhering to them and the Presbytery of Louisville on the other, we have nothing to do, and we shall therefore only state and consider such facts as seem to us to have some bearing upon the questions we are to decide, and if it shall happen that we state other and immaterial facts, it must be attributed to our inability at all times to distinguish and separate that which is relevant from the much greater volume of that which is irrelevant.
*257 We then proceed to a statement of the facts according to the principles just announced:
Prior to 1819 there was organized in Louisville a Presbyterian Church, of which the First Church is the legal successor. That church was in connection with the Presbyterian Church in the United States of America. In 1819 a certain lot was conveyed to the trustees, to be held “ in trust for the use and benefit of the Presbyterian Church, sect and congregation of Christians at Louisville, . . . and as a place of Christian worship forever, and to and for no other use whatever.”
This lot was subsequently sold and the proceeds invested in a lot on Green and Sixth Streets, which was conveyed to trustees “ in trust for the benefit of said Presbyterian Church and Presbyterian sect and congregation of Christians now known and called the First Presbyterian Church of Louisville, and as a place of Christian worship forever, and for no other use or purpose whatever.”
In January, 1870, a lot on Chestnut Street was conveyed to the trustees of the First Church, to be held for the “ use of said First Presbyterian Church congregation, whose pastor is Rev. S. R. Wilson, and whose elders are Samuel Cassaday, Patrick Joyes, Jos. Nourse, and their associates, and the regular succession of said congregation irrespective of their presbyterial, synodical, or assembly relations, for a mission or mission-school, chapel} and such other religious, literary, or congregational uses as the said congregation or its officers may deem advisable.”
At the time the deed to the lot on Green and Sixth streets was made the First Presbyterian Church of Louisville was in connection with the Presbyterian Church in the United States of America. But at the time the deed to the Chestnut-street lot was made it was in admitted connection with the Presbyterian Church in the United States, an organization which, *258 though Presbyterian in its faith, doctrine, and form of government, is wholly separate and distinct from the Presbyterian Church in the United States of America.
In September, 1874, the session of the church consisted of the Rev. S. R. Wilson, pastor, and ten ruling elders, viz. Patrick Joyes, Samuel Cassaday, N. D. Hunter, J. C. Allen, W. L. Clarke, R. K. White, J. V. Escott, Wm. Lindsay, R. J. Crawford, and L. L. Anderson.
Disagreements having arisen between the pastor and elders Joyes, Cassaday, Hunter, Allen, Clarke, and White, they (September 15,1874) addressed a letter to the pastor, as moderator of the session, asking letters of dismission from that church for themselves and the members of their families.
September 18th, session met and granted the request; and September 26th, letters were delivered to the applicants.
October 14th, the letters were all returned to the pastor, who refused to receive them.
Between the time of receiving and the time of offering to return the letters of dismission given to the seven elders they prepared a memorial to the Louisville Presbytery, of which the First Church was a constituent, asking for an investigation by the presbytery into the differences between themselves and the pastor.
A similar memorial was also addressed to the presbytery • by J. C. King and two other lay members. October 2d, the moderator of the presbytery, having been called upon in conformity with the law of the church, issued a call for a special meeting of presbytery to convene in the city of Louisville, October T5th, “for the purpose,” among other things, “of visiting and examining into the disturbances and difficulties that have arisen in the First Presbyterian Church, in Louisville, and acting upon them and the memorial of sundry members of the church on that subject;” and “for the purpose of investigating and remedying the troubles that have arisen be *259 tween the pastor of the First Presbyterian Church of Louisville, and sundry persons who are or have been ruling elders in said church, and of considering and acting upon the memorial of some of those persons.”
Notice of the called meeting was given as required by the law of the church, and presbytery convened in accordance with the call of the moderator.
When that item in the moderator’s call relating to the memorial of King and others was called, “Dr. S. R. Wilson objected to receiving the memorial..
“ The moderator decided that the memorial must be received and read in order to enable presbytery to proceed intelligently. An appeal was taken, and the moderator’s decision sustained.”
“ Whereupon Dr. Wilson moved that the memorials be not received,” but after discussion, the motion was lost by a vote of 18 to 5.
“ Whereupon S. R. Wilson gave notice of an appeal to a superior court from the decision, and that he would not take any further part in the investigation, or x’espond to any thing in it until his appeal is heard in the superior court.”
The memorial of King and others was read, and then there was presented to presbytery, by the clerk of the session of the First Church, a copy of certain minutes of the session, composed of the pastor and the three remaining elders; and also a remonstrance by the session, thus constituted, and sixty-one members of the church, denying that any disturbances or difficulties existed in the church, and protesting against presbytery doing any thing to disturb the harmony of the church or the relations between the protestants and the pastor.
These papers were received, the memorial of Joyes and his associates was read, and thereupon the following resolution was unanimously adopted, viz:
“That the memorial, with the accompanying papers, be *260 placed in the hands of a committee with instructions to examine carefully into the grievances alleged, and the facts stated therein, receiving and examining also any other statements that may be laid before them, either in the way of illustration and proof, or in the way of challenge and disproof, from any of the parties concerned, and report the results of their investigation to the approaching stated meeting of the presbytery, together with any suggestions that they may deem wise touching the further action of presbytery in the case.”
After hearing the memorial of King and others, and the protests of the session and sixty-one members, the following resolution was adopted, but by what vote the minutes do not show, viz:
“That a committee consisting of the moderator and two other members of the presbytery be appointed to confer with the memorialists and any in the congregation who sympathize with them, and the members who protest and the session of the First Church of Louisville, to ascertain whether there be any thing in the present state of that church, or any existing evils in it, which call for any further action of presbytery in regard to the First Church, and report the result of their inquiries to the approaching stated meeting of presbytery.”
It was then ordered that the committees provided for by these resolutions should consist of the same persons, and the members of the committee were chosen by presbytery.
At the same session of the presbytery there was laid before it the minute of the session of the church, granting letters of dismission to the seven elders and their families, which they regarded as impugning their Christian character and inconsistent with the letters given to them certifying to their good standing in the church.
Thereupon all the members of the families of the elders addressed to the church session a note withdrawing their application for letters, and declaring their intention to retain their membership, and returned with it the letters.
*261 Presbytery met in regular session November 15, and the committees appointed under the foregoing resolutions made report, and’presbytery resolved, among other things touching the memorial of Joyes and his associate elders, as follows :
“That presbytery hereby advises the memorialists to resume their position as members and ruling elders in the First Church, Louisville, and hereby directs the session to receive them as such.” The resolution also expressed the opinion of presbytery that on account of certain facts therein stated the letters of dismission were “ practically null and void,” and declared that those who had received them were members in good standing in the First Church.
On the memorial of King and others the committee reported and presbytery resolved
“ That the presbytery expresses its great concern touching the troubles which, as it appears from the inquiries of the presbytery’s committee, are apparently destroying the peace and impairing the influence of the First Church of Louisville, and deems it the duty of presbytery to formally visit said church, according to the provisions of our book, ‘ for the purpose of inquiring into its state and redressing the evils that have arisen in it;’ and it being the purpose of presbytery to hold an adjourned meeting in Louisville the second Tuesday evening, December 8th, at 7.30 o’clock, upon the day following said date (December 9th) with a view to such inquiry into the state of the church, it hereby notifies and requests the officers of said church and the congregation to be present at said meeting with any suggestions they may have to make looking to a removal of their troubles.”
At the same meeting, November 16th, in view of certain utterances of Dr. Wilson, regarded as a contempt of presbytery, that body resolved that he “be not allowed to speak before presbytery until he shall have humbly apologized to *262 presbytery, and made proper acknowledgments to some of his co-presbyters.”
To this resolution Dr. Wilson responded that he “would not again sit in presbytery, nor recognize as of any binding force any other action that they might thereafter take touching himself or his ministry, until the aforesaid unlawful action was repealed, and the injury it had done him, as far as possible, was repaired by presbytery.”
The resolution suspending him from the privilege of speaking before presbytery was passed November 16th, and on the 18th the session, composed of the pastor and elders Anderson, Crawford, and Lindsay, adopted a minute, in which, after reciting most of the acts of presbytery herein recited, and declaring them to be in violation of the constitution of the church, contrary to the word of God, destructive of the rules and discipline of the Presbyterian Church, and in derogation of its time-honored methods of proceeding, and calculated to bring the church into contempt; and also declaring there were no reasonable grounds to expect that presbytery would be stopped from enforcing its illegal requirements by any appeal that might be made to synod or general assembly, and that “ under these circumstances there is left the pastor, the session, and the congregation no other means of protecting themselves against the aforesaid arbitrary acts; therefore,
“ Resolved, That this session do hereby approve of the course taken by the pastor of the church in declaring that •he would not again sit in the presbytery ■ after the passage of the resolution depriving him of his constitutional right to speak in that body; and in declaring that he would not recognize as of any binding force any other action that they may hereafter take touching himself or his ministry, until the aforesaid unlawful action is repealed, and the injury it’ has done to him, be, as far as possible, repaired by the presbytery ; and further, that as they .have taken away his right of *263 freedom of speech before the presbytery, he would still continue to exercise that right as a minister of Christ, and as a pastor before the whole church, and the particular church over which the Holy Ghost has made him an overseer.
“ Resolved, That we hold ourselves absolved from all obligation to obey, or in any way to carry into effect the judgments, directions, or recommendations of the presbytery, passed after the violent and illegal exclusion of the pastor of the church from his rights and privileges as a member of that body.'
“ Resolved, That the action of the presbytery in the premises, based as it is upon the dangerous and unscriptural assumption that the presbytery is the master, and its will is law, and that the pastors and churches and congregations are its subjects, and their duty implicit obedience, has left us no alternative but either, on the one hand, to surrender the crown rights of Jesus our king, and our rights and liberties as his people, to the uncontrolled will of any faction who may happen to have the majority in the presbytery; or, on the other hand, in openly refusing in any way to submit to or acquiesce in that action, to maintain those rights unimpaired. The latter course is that to which we are plainly called by every obligation and motive as faithful Christians and true Presbyterians. In deliberately adopting it as we now do, solemnly and in the fear of God, we wish it distinctly understood that it is from our love for the most vital principles of the church of our fathers, and as the only way now left us to maintain our fidelity to those principles, that we feel constrained to refuse to be identified in any manner with those who have usurped dominion over us, or to submit to those acts by which the divine order and freedom, with which each particular church has been endowed by its Head, have been to so fatal an extent subverted.
“ Resolved, That in all this we intend to stand fast by the word of God, and the standards of the church as founded upon and interpreted by that word, as far higher authority *264 than any presbytery, and to which, as containing the supreme law of Christ’s house, the presbytery, as well as all other church courts, is subject and amenable, and we solemnly declare that we will not hereafter recognize the jurisdiction of any presbytery that recognizes the validity of the revolutionary, despotic, and destructive acts of the Presbytery of Louisville, passed at the meeting above referred to, but will continue to stand in real, though informal fellowship with all such churches and ministers as stand in the old ways, and adhere to the truly apostolic order of the church.
“jResolved, That in view of the unscriptural and illegal course of which we complain, and its disastrous effects, we feel it more incumbent upon us to stand in our lot and contend earnestly for that form of sound words which has been delivered to us; so that all men may see how utterly impossible it is for such grievous and cruel things to be done and upheld by men calling themselves Presbyterians without first they trample under foot the most sacred and precious principles of scriptural Presbyterianism.”
November 22, Dr. Wilson, and Anderson, Crawford, and Lindsay, and the congregation adhering to them, convened in the church, and after listening to an address by the pastor and to the reading of the foregoing minutes, the following resolution was offered:
“ Resolved, That we, the congregation of the First Presbyterian Church, do hereby approve and ratify the foregoing action of the session of the church.
“ That we desire the relation now existing, and which has existed for nearly ten years past, between us and our pastor, the Rev. Samuel R. Wilson, D.D., to remain unchanged, and pledge to him our most cordial support in his pastoral work and in his efforts to maintain the pure doctrine and order of the church, and protect the flock against those who have first wronged it, and now, while professing to seek to *265 promote its harmony and prosperity, in all their acts tending to destroy it.”
For this resolution the following was offered as a substitute:
“Resolved, By the congregation, that we do not at this time take any position looking to independency, or to any other ecclesiastical connection.”
The substitute was rejected, and the original resolution adopted.
November 28, the seven elders who had received letters of dismission, in accordance with the advice of presbytery, notified the pastor and remaining elders of their desire to resume the exercise of their functions as ruling elders, and asked that a meeting of session be- called. This letter was returned to them, by one of the deacons of the church who adhered to the pastor, without having been seen by the pastor, or, as far as appears, by either of the three elders then claiming to constitute the session.
Presbytery convened in adjourned meeting, December 8, when the foregoing minute of the session and resolution of the congregation were laid before it by a letter from the clerk of the session which also informed presbytery that the First Church would not be open for its contemplated visit on the 9th of that month.
There was also laid before presbytery a petition signed by sixty-seven members of the church, including those who had applied for and received letters of dismission, numbering twenty-two, praying for a dissolution of the pastoral relation of Dr. Wilson with the church.
Having been denied admission to the First Church, presbytery adjourned to the Second Church, rescinded the resolution of November 16, forbidding Dr. Wilson to speak before presbytery, and ordered him to be cited to appear before ari adjourned meeting to be held on the next day at 11 A. M., to *266 show cause why the pastoral relation should not be dissolved. That citation was served about half-past 9 o’clock on the morning of the 10th. At a few minutes before 11 o’clock presbytery was regularly closed, and at 11 was again regularly opened and proceeded, Dr. "Wilson not appearing, to declare the pastoral relation dissolved, and to appoint one of its members to preach to the congregation and declare the pulpit vacant; and also directed the three elders adhering to the pastor to cease to act as ruling elders of the church. The Rev. Mr. Cook, a member of presbytery, in accordance with the law of the church, caused all these proceedings of presbytery to be brought before the general assembly, where they were declared not to require revision.
The seven elders convened and organized as a session and directed the trustees to open the church for a meeting of the congregation, which they, not recognizing the authority of these persons as ruling elders, refused to do.
That part of the congregation adhering to the seven elders, and submitting to the authority of presbytery, was then convened at, another place, and Dr.Wilson, an'd Lindsay, Crawford, and Anderson, still claiming to act as ruling elders, and that part of the congregation adhering to them, and denying the authority of and refusing obedience to the presbytery, continued in possession of the church-property.
It had been the custom of the church to elect trustees annually, in January, and accordingly each body claiming to be the First Presbyterian Church, held an election in January, 1875, and elected trustees; and in February of that year this suit was brought by King and others, claiming to be trustees, Joyes and his associates claiming to be ruling elders, and S. W. D. Stone and others claiming to be members of the First Presbyterian Church of Louisville', against Dr. Wilson, claiming to be pastor of that church, and J. M. Duncan and others claiming to be trustees, William Lindsay and others claiming to *267 act as ruling elders, and George Harbison and others claiming to be members of said church, to recover possession of the property. The court below, Hon. Alvin Duvall, special chancellor, dismissed the petitiop, and the plaintiffs prosecute this appeal.
Learned counsel for the parties agree that the sole question for decision is, which'of the contending parties is that “said Presbyterian Church and Presbyterian sect and congregation of Christians known and called the First Presbyterian Church of Louisville,” referred to in the deed to the property on Green and Sixth streets, and referred to in the deed to the Chestnut - street property as “the said First Presbyterian Church congregation.” And both parties appeal for support in their antagonistic claims to the standards of the church, known as the Form of Government, and Book of Discipline, and the usages of the Presbyterian Church, and the deliverances of its judicatories.
The appellants contend that no body or congregation of persons not organized and governed according to that form and. system of church government called “presbyterial,” and accepting the Westminster Confession of Faith as its creed, will answer the description of the beneficiary mentioned in the deed to the property on Green and Sixth streets. While the appellees contend that as external connection with a general church organism is not expressed to be a condition to the right to use and enjoy the property, the majority of the congregation as it existed at the time these differences commenced had a right to control the property, and to sever the connection then existing with the Presbyterian Church in the United States, and to remain ah independent church, provided it continued to be Presbyterian in faith, or to unite themselves with any general organization of Presbyterians. A majority of the congregation agreed and cooperated with the appellees, and consequently, whether they are correct in the position assumed, is the first question for decision.
*268 From a period anterior to 1819, to the time when the church known as the Presbyterian Church in the United States was organized, the First Presbyterian Church was in continuous connection with the Presbyterian Church in the United States of America. At the organization of the former of these organizations the First Church, by unanimous consent, became a part of it, and so continued up to the commencement of the differences which have ultimated in this litigation.
Both of these general organizations were all the time governed by the presbyterial system, by which the church at large is divided into numerous local bodies, styled congregations, the -fthole being under the government of an ascending series of judicatories called sessions, presbyteries, synods, and general assembly, each having certain defined powers and jurisdiction, and being subject to the supervisory and revisory powers of those above it.
Congregations are bound by the action of their respective sessions, if the matter determined be within its jurisdiction, and the sessions are bound in like manner by the action of their presbytery, presbyteries by the action of their synod, and synods by the action of the general assembly. Besides its revisory power, presbytery has original jurisdiction of certain matters to which we may have occasion to refer in a subsequent part of this opinion.
The deed declares the use of the property to be “ for the benefit of said Presbyterian Church, and Presbyterian sect and congregation of Christians now known and called the First Presbyterian Church of Louisville,” etc.
What, then, was meant by the phrases “ Presbyterian Church ” and “ Presbyterian sect and congregation, now (then) known and called the First Presbyterian Church of Louisville?” There.are now two congregations, each Presbyterian in faith, and each styling itself and claiming to be the First Presbyterian Church of Louisville. By what rule shall *269 we be governed in ascertaining which is the true First Church for whose use the trust was created?
That one party has a majority of the congregation as it existed at the time of the disruption, is necessarily conclusive, if the position of appellees already stated be correct. But before adopting that method of disposing of the question, and - deciding that the appellees are entitled to the property, by force of the facts that they constitute a majority of the church, as it existed at the time the disruption occurred and are Presbyterian in faith, it is necessary to inquire whether a simple profession of the Presbyterian creed is sufficient to constitute a Presbyterian church and a Presbyterian congregation in the sense in which those phrases are used in the deed.
These phrases, especially when used by Presbyterians in reference to matters pertaining to their church affairs, should be understood in their technical sense, that is, in the sense in which Presbyterians ordinarily use and understand them.
That sense may be readily seen and understood by a reference to their Form of Government then in force and to which the First Church of Louisville was then and has ever since been subject. That authority declares that “ the universal church consists of those persons, in every nation, together with their children, who make profession of the holy religion of Christ and of submission to his laws; ” and “ as this immense multitude can not meet together in one place to hold communion, or to worship God, it is reasonable and warranted by scripture example that they should be divided into many particular churches;” and it also declares that “a particular church consists of a number of professing Christians, with their offspring, voluntarily associated together for divine worship and godly living, agreeable to the holy scriptures, and submitting to a certain form of government.” (Chapter 3, Form of Government, 410.)
It is also further declared that “ It is absolutely necessary *270 that the government of the church be exercised under some certain and definite form. And we hold it to be expedient, and agreeable to scriptwre and the practice of the primitive Christians, that the church be governed by congregational, presbyterial, and synodical assemblies,” etc. (Sec. 1, chap. 8.)
The church session is the governing body of a particular congregation or church, and is composed of the pastor or pastors and the ruling elders (sec. 1, chap. 9), “ and is charged with maintaining the spiritual government of the congregation.” (See. 6, chap. 9.)
“ The church being divided into many separate congregations, these need mutual counsel and assistance, in order to preserve soundness of doctrine and regularity of discipline, and to enter into common measures for promoting knowledge and religion, and for preventing infidelity, error, and immorality.
Hence the usefulness of presbyterial and synodical assemblies.” (Sec. 1, chap. 10.)
It thus appears that, tested by the Form of Government, a congregation or particular church is a body of professing Christians and their children, voluntarily associated together and submitting to a certain form of government, and that a Presbyterian congregation or particular church is a body of professing Christians and their children “governed by congregational, presbyterial, and synodical assemblies, and consequently there can be no such thing as a Presbyterian congregation or church not having a church session, and not being in connection with and governed by a presbytery and synod. Connection with and subjection to the recognized presbyterial system of government is as essential to constitute a Presbyterian church or congregation as belief in the Westminster Confession of Faith. Faith and government are alike, and equally necessary to constitute a Presbyterian church, and a church having no other than a congregational government, although *271 adopting the Presbyterian creed, is no more a Presbyterian church than a congregation governed by the presbyterial system, and adopting the thirty - nine articles of faith of the Episcopalian Church.
We are therefore of the opinion that no religious society, not subject to a presbytery and synod, will answer the description of the beneficiary mentioned in the deed.
The body represented by the appellees was not in connection with any presbytery or synod when this suit was brought, and therefore was not then the beneficiary of the trust. But before the judgment was rendered it had connected itself with the Presbyterian Church in the United States of America, and, at the date of the judgment, answered the description in the deed.
We turn now to inquire whether the body represented by the appellants answers that description. That it is Presbyterian in faith is not questioned, nor is it questioned that it has all the time been subject to the government of a presbytery or synod, but this is not sufficient; it must also have been subject to a lawful session, for it could no more exist as a Presbyterian Church without a session, than its adversary could without subjection to a presbytery and synod. That it has all the time had a lawful session, composed of a majority of the session of the church, as constituted at the time the disruption occurred is clear, unless, as appellees contend, Joyes and his associates ceased to be ruling elders in consequence of having applied for and received what is styled in the record “ letters of dismission.”
We omit any inquiry into the question whether the presbytery had power to direct Joyes and his associates to resume their positions as members and ruling elders, for no such direction was given. Presbytery merely advised them to do so, and while it directed the session to receive them as such, that direction, of course, was contingent upon Joyes and his- *272 associates deciding to act upon the advice given to them. Presbytery afterward recognized them as ruling elders, but it is not claimed that such recognition could have constituted them elders, and whether they were lawful elders, must at last depend upon the question whether their application for and receipt of letters of dismission divested them of their character of ruling elders.
No one not a member of a particular congregation can be a ruling elder over it. The first inquiry then, is, did they cease to be members of the First Church in consequence of having applied for and received letters?
Upon this subject there are no distinct provisions in any of the standards of the church. But of a number of learned Presbyterian divines who were examined as experts, all, save one, gave it as their opinion that a letter of dismission did not terminate the membership of the person to whom it was given, until he was received into some other church; and that conclusion is sustained by a number of deliverances of the higher judicatories of the church, and must be accepted as established.
The same witnesses gave it as their opinion that the functions of a ruling elder do not cease in consequence of his receiving a letter of dismission. There is, however, some apparent conflict in the deliverances of the judicatories on this subject, but there is, on all the evidence bearing on the subject, a clear preponderance in favor of the conclusion that official functions, like individual membership, are not affected by receiving a letter. The question was presented to the general assembly by Mr. Cook’s complaint, and the action of that body must be deemed at least an expression of the opinion of a majority of its members that Joyes and his associates did not lose their official character by receiving letters of dismission; for, although presbytery did not declare that they were still ruling elders, yet it implied as much by advising them to assume their functions as such, and by directing the session to *273 receive them in that character and by subsequently recognizing them as office-bearers, and had the assembly not also regarded them as still lawful ruling elders, it certainly was called upon to revise the action of presbytery in these particulars. And this conclusion is further sustained by the fact that what is ■styled in the record a letter of dismission is called in the Book •of Discipline a “ certificate of membership,” which is a misnomer if its office is not to evidence the existence, but the termination of membership.
We therefore conclude that Joyes and his associates never ceased to be ruling elders, and as they constituted a majority of the governing body of the congregation, after they gave notice to the three remaining elders (even if the three were not deprived of the power to act as such by the action of presbytery), that they would resume action as ruling elders, and the three refused to act with them or recognize their authority, all the acts of the minority, assuming to constitute the church session, were void.
We are therefore of the opinion that the body represented by Joyes and his associates has all the time maintained a legal organization and the necessary external relations with the gen-oral organism to constitute it, at all times, a “Presbyterian church ” and a “ Presbyterian sect and congregation,” and that it is the continuation of that organization and successor of that congregation to whose use the property on Green and Sixth streets was conveyed, and that the body represented by the appellees is a new and distinct church brought into existence by its repudiation of the authority of the lawful session ■of the First Presbyterian Church of Louisville and its lawful .superior, the Presbytery of Louisville, and its subsequent organization in violation of the laws of the Presbyterian Church.
We are the less reluctant to reach this conclusion, because it is in harmony with the conclusion which seems to have been reached by the higher church courts to which both par *274 ties were originally subject, and obviates the necessity for entering into an inquiry into the jurisdiction of the presbytery so earnestly denied by the counsel for the appellees, and which was denied by the learned judge who decided this case in the court below.
The property on Chestnut Street was conveyed to the use of the “ First Presbyterian Church congregation, whose pastor is (was) the Rev. S. R. Wilson, and whose elders are (were) Samuel Cassaday, etc. . . . and the regular succession of said congregation, irrespective of their presbyterial, synodical, or assembly connections, etc.”
We haye already decided that the body represented by the appellants is the lawful First Presbyterian Church and congregation, and as the Chestnut-street property was conveyed to the use of that congregation, it follows that they are also entitled to it.
■ Joyes and his associates being the only lawful ruling elders of the church, and they and their adherents constituting that church, the trustees chosen by them are the lawful trustees, and hold the title to the property.
These conclusions render it unnecessary to enter upon an inquiry into the legality of the action of the presbytery, so far as that action has been supposed to bear upon the right of either party to the use of the property in contest. And, for the same reasons we need not consider its action in respect to the three elders acting with the appellees, for whether they were deprived of power further to act as ruling eldei’s or not, does not affect the property-rights of either party.
And for like reasons we need not look into the action of the presbytery in declaring the pastoral relation of Dr. Wilson' with the First Church dissolved.
If the action of the presbytery in reference to him, and the three elders adhering to him, was extra - constitutional, they no doubt had a perfect right to disregard it, but that-did *275 not justify them and their adherents in refusing to recognize the right of Joyes and his associates to act as elders, nor in renouncing the authority of the presbytery in respect to any matter over which it had constitutional power, nor in declaring themselves independent of all the higher judicatories of the church, nor in organizing themselves into a new organization under the name of that church and congregation whose legally constituted authority they had renounced.
If presbytery had no authority, in the exercise of its visitorial power, to dissolve the pastor’s relation with the congregation, its attempt to do so was a mere brutum fulmm, and he had a perfect right to disregard it. But whether it had such power or not, it seems to us perfectly clear that its action in regard to the pastor, who was not a member of the congregation or church, can not have the slightest influence in the determination of the questions before this court for decision. It can not, in the nature of things, be true that the action of presbytery in dissolving the pastoral relation was void, as appellees contend, and yet that that void action can affect the decision of the question as to which of these contending bodies is the true First Presbyterian Church of Louisville.
The action of presbytery, if void, injuriously affected Dr. Wilson’s rights as pastor of the lawful First Church, and he might have prevented the execution of its order dissolving the pastoral relation and declaring the pulpit vacant by injunction; or he might have disregarded the action of presbytery and continued to occupy the pulpit and have resisted on the ground that such action was an attempt by legal proceedings to dispossess or silence him. And if he was now claiming that he is still the lawful pastor of the First Church, no matter which of these contending parties may be adjudged to be that church, then the question whether his relation to that church had been dissolved by the action of presbytery' would be pertinent.
*276 But he occupies no such position. He does not claim to be pastor of the congregation represented by the appellants or of the First Church except on the hypothesis that the body represented by the appellees is that church. He has abjured his allegiance to that general organism, under which he held the pastorship, attempted to be dissolved by presbytery, has openly renounced its authority, and declared he would not again submit to its government, and now has no other interest in this litigation than such as he may have as pastor of the congregation which we have already decided is not the congregation over which he was pastor prior to the dismemberment, out of which this unfortunate strife has arisen; and he can have no right to occupy the pulpit after the congregation of which he became pastor after or at the time it withdrew from the First Presbyterian Church of Louisville is dispossessed.
In support of their position that, as a connection with a general church organization is not required by the deed, the right to the use of the property is in the congregation irrespective of any external connection, appellees’ counsel cite a number of authorities, chief among which is Presbyterian Congregation v. Johnson, 1 Watts & Sarg. 1.
In that case the Messrs. Penn conveyed certain real estate to trustees for the use of “the religious societies of English Presbyterians and their successors in and near the town of York.”
When, in 1838, the Presbyterian Church was divided into what has since been known as the Old and New School Presbyterian churches, a majority of the church at York, which had previously been in connection with the Presbytery of Car-lisle, refused to recognize the authority of that presbytery and connected themselves with what was styled the Presbytery of Harrisburg, established by the New School Church.
The minority adhered to the Presbytery of Carlisle, and each party having elected trustees in conformity to the provis *277 ions of the articles of incorporation of the society, and each claiming to be the incorporated society, and the majority being in possession, the minority brought an action to recover the property.
Three out of five judges held that as no particular Presbyterian connection was prescribed by the founders (the Penns), or established by the charter, the majority was entitled to the property, and, if such connection had been prescribed, there had been no adhesion to a connection essentially different, and that the breaking up of the original Presbyterian confederation into two parts of nearly equal magnitude had released the congregation from the duty of adhering to any particular part of it in exclusion of another. From this conclusion two of the five members of the court dissented.
The opinion of the majority of the court was delivered by Chief Justice Gibson, who laid much stress upon the presumed intention of the Messrs. Penn, whom he treated as the founders of a charity, whose intentions were to be looked to in construing the grant, and also upon the fact that this disruption of the church was revolutionary, and left each congregation, presbytery, and synod in a great measure free to choose between the two organisms of nearly equal magnitude, into which the “Presbyterian Church in the United States of America” had been divided. (Trustees, &c. v. St. Michael’s Evang. Church, 48 Pa. St. 20, and McGinnis v. Watson, 5 Wright, 41; Pa. St. 9, are also cited in this connection.)
In the former case a majority of the congregation remained and kept up the original organization; the minority withdrew and established a new organization. Subsequently the old organization severed its synodical connection and formed another, and the new organization sought to recover the church property on the sole ground of that change of connection. There is a clear distinction between that case and this. Here, as we have decided, the appellants have kept up the old organ *278 ization, and stand in the place of the defendants in that case in this respect; and the appellees here, having organized a new church, stand in the position of the plaintiffs in that case. Speaking of the plaintiffs in that case the court said: “ They voluntarily withdrew from the church and congregation, and formed a new association, established a church, and erected a new edifice for themselves. They seceded.” The appellees voluntarily withdrew from the organization known as the First Church, and formed a new organization and a new and different connection, and stand in the same position occupied by plaintiffs in the case we are discussing, in the important particular that they are a new organization, and not the original First Presbyterian Church of Louisville, to whose use the property was conveyed, nor its successor according to the law of the church by which its organization .was to be preserved and perpetuated.
The opinion in McGinnis v. Watson does not, in our opinion, sustain the position of counsel, but is rather an authority in support of the conclusion we have reached. The opinion is quite lengthy, and we extract from the head-notes the following, which is a correct presentation of the views expressed by the court:
“ Independent churches have their law in their own separate institutions; associated churches, theirs, in their own rules and in those of the associated organism.”
“ The title to the church property of a divided congregation is in that part of it which is acting in harmony with its own laws; and the ecclesiastical laws, usages, customs, and principles which were accepted among them before the dispute began, are the standards for determining which party is right.”
Tested in this way, the body represented'by the appellants is that for whose use the. property in contest was conveyed. Its organization has been all the time kept up in accordance with the laws and usages of the Presbyterian Church, indeed *279 is the identical organization that existed at the time the differences commenced.
The deed to the property in contest in Trustees v. Seaford, 1 Dev. Eq. 453, was to the “trustees and elders, and their successors in office, for the Lutheran congregation, belonging to the Second Creek Organ Meeting House,” but was absolute upon its face, not specifying any particular purpose to which the premises were to be appropriated. It was simply a conveyance of the land for a valuable consideration.
The church was then congregational. Subsequently the Lutheran Church adopted the synodical form of government, and a majority of the congregation of Organ Meeting House sent delegates to represent it in synod. The minority organized by the election of the necessary congregational officers, and brought suit to recover the church property. The court said of the plaintiffs: “It appears that they are seceders from the church, and are not the trustees or representatives of it; that they were a minority of the members before their secession. Had they remained in the church, they must have yielded to the government of the majority.”
The conveyances not being for a specified purpose, the congregation had a right to use it for any lawful purpose, and in determining to what use it should be appropriated, in the absence of any law or usage of the church to the contrary (and none such appears in the report of the case), a majority must necessarily govern, and be considered and treated as the congregation. But here the case is wholly different.' The law and' usage of the Presbyterian Church prescribe and define what is required to constitute a particular church, and when property is conveyed to the use of a particular congregation the standards of the church furnish the criteria by which its identity is to be determined, and the decision of that question can not be affected by mere numbers.
Many other cases have been cited, but the length to which *280 this opinion has been extended admonishes us that we can not. examine them separately; it must therefore suffice to say as to the decisions of other courts, that none of them, except that in 1 Watts & Sargeant, seem to us to conflict with the conclusion we have announced.
The New York and New England cases cited, especially the former, have no application. They relate mainly to congregational churches, or were decided under the statutes providing for the incorporation of religious societies, by which the absolute control of the property of incorporated churches is vested in a lay corporation of which the members of the congregation are the corporators, and these corporators are held, in the absence of restrictions in the deed under which property is held, to have the same power of control over it that is possessed by other lay corporations over their corporate property. (Petty v. Tooker, 2 N. Y. 269; Robertson v. Bullions, 1 Kern. 243; Burrel v. Associate Reformed Church, 44 Barb. 282.)
In Gartin v. Penick, 5 Bush, 110, the original deed was to. the trustees for the use of the “ Bethel Union Church,” without-other description or identification, and the subsequent deed, by the same grantor, to the “ Bethel Union Church adhering to the general assembly,” was inoperative, because the grantor had divested himself of all title by the first deed.
Befóte the division of the congregation it unanimously severed its connection with the New and associated itself with the Old School Presbyterian Church, but this fact “ did not either affect their identity, or, per se, subject their property to the jurisdiction of the general assembly, or change their tenure of it so as to make it dependent on adherence to that council.” It will be observed that the deed did not describe the beneficiary as a Presbyterian Church, and therefore that the case furnishes no ground for rejecting the inference we have drawn from the deed in this ease, that the beneficiary must be in *281 such connection as makes it a Presbyterian Church, according to Presbyterian standards.
The case of Harper v. Straws, 14 B. Mon. 48, seems, on a casual reading, to be directly in point, and to support the views of appellees’ counsel, but on a more critical examination of its facts it is plainly distinguishable from this case, and the decision of the court was, in part at least, based upon that distinction. The deed was to trustees “for the use and benefit of the religious Methodist Society of the African race, now worshiping, or which may hereafter worship, in said church now called Asbury Chapel.” The society was then in connection with the Methodist Episcopal Church, South, but afterward, its pastor being expelled from that church, the society adhered to him, and continued to worship for some time under his pastorship without connection with any other organization. “In a short time, however, he and they, at his instigation, were received into connection with a body called the African Methodist Episcopal Church of the United States,” etc. By adhering to him after his expulsion from the Methodist Church, South, and going with him into another and distinct organization, all connection with the church with which the society was formerly connected was severed by their voluntary and unanimous act or acquiescence, and as the deed made no reference to the connection of the beneficiaries with any other church organization as essential to their rights, the society was entitled to the property.. There was not, as in this case, a minority insisting on remaining in the old connection, but all assentechjto the separation. Harper was the leader and pastor of the congregation asserting the right to the use of the property, and, as they alleged, many of the members of his congregation were members of the original congregation, worshiping at Asbury Chapel, which voluntarily withdrew from connection with the Methodist Episcopal Church, South, and united with the African Methodist Episcopal Church of *282 the United States. It was in view of these facts that the court said that “ As the deed makes no reference to the connection of the beneficiaries with any other church organization as essential to their rights, the continuance of the connection which existed at its date, can not be regarded as entering into the question of identity, by which it is to be determined who are the beneficiaries.”
.That the voluntary action of the congregation in adhering to their pastor and going with' him into another organism was regarded as having an important bearing on the question, is evident from the following quotation from the opinion:
“Its (the congregation’s) external relations can, at most, constitute auxiliary considerations only for determining the question of identity between the parties claiming that identity. Thus, when upon the expulsion of Harper from the Methodist Episcopal Church, South, the whole body of his congregation adhered to him as their pastor, and thus, in effect, repudiated their connection with the general organization, and when they afterward, with him, became a pp,rt of the African Methodist Episcopal Church of the United States, they continued, notwithstanding these changes in their external relations, to be the identical society for whose use the deed conveyed the property, and were still entitled to the use, because these external relations constituted no part of the description of the beneficiaries, and, not being referred to at all in the deed, they can not be regarded as entering into the motive or consideration on which it was made.” No question of identity arose until after the separation from the M. E. Church, South, occurred, and the language of the court when all considered together gives but little, if any, support to .the conclusion that if at the time the tohole congregation withdrew from connection with the M. E. Church, South, only a majority had so withdrawn and a minority had remained and claimed the property that they woixld not have been adjudged entitled to it. That the *283 mere fact that a majority of the menders of the original society which had gone as a whole with Harper into the African M. E. Church still adhered to that church, and that only a minority now united with him to recover the property, exercised no controlling influence in the decision, is evident from the fact that the court said “that it the question of property depended on determining on which side the majority was, it might deem it necessary to remand the case for the better ascertainment of that fact.”
Having disposed of all the questions presented which seemed to us to be necessary to a decision of the case, and reached the conclusion that the body represented by the appellants is that “ Presbyterian Church and Presbyterian sect and congregation ” for whose use the property on Green and Sixth streets was conveyed, and the First Presbyterian Church congregation for whose use the property on Chestnut Street was conveyed, and that Dr. Wilson, not claiming to be the pastor of that congregation, is no longer entitled to occupy the pulpit in the church-edifice, to the use of which the appellants and their associates are entitled, the judgment is reversed, and the cause remanded for a judgment in conformity to this opinion.