15 N.J. Super. 82 (1951)
83 A.2d 45
DAPHNE ROBERT LEEDS, ET ALS., PLAINTIFFS,
v.
EDNA M. HARRISON, ET ALS., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 21, 1951.
*88 Mr. James N. Butler for the plaintiffs (Messrs. Moore, Butler & McGee, attorneys).
Mr. Weidner Titzck and Mr. Jacob Stam for the defendants.
Mr. Theodore D. Parsons, Attorney-General, for the State of New Jersey.
HANEMAN, J.S.C.
The allegations of the complaint herein are set forth in considerable detail in the opinion filed in connection with the defendants' motion for a dismissal, as reported in Leeds v. Harrison, 7 N.J. Super. 558, 72 A.2d 371 (Ch. Div. 1950), and will, in the interest of brevity, not again be here repeated. The statement thereof, as there set forth, may be considered as if herein repeated in detail. Following the rendition of said opinion, the Attorney-General of the State of New Jersey was joined as a party defendant and filed an answer, the gist of which is that he appeared for all persons named in the first and fourth counts of the complaint, and the classes they represented, and requested this court to determine their respective rights. Let it be noted again, however, that the plaintiffs may be grouped as *89 member, non-member, and contributor plaintiffs, the latter being represented by the Attorney-General.
The defendant Young Women's Christian Association of Atlantic City, New Jersey, will hereafter be referred to as YWCA.
The issues, as further reduced from the statement as contained in the pretrial order, and eliminating those which defendants were successful in dismissing at the close of plaintiffs' case, are as follows:

I
Were the 12 named individual non-member plaintiffs legally denied membership in the defendant YWCA, and do they or the member plaintiffs have the right to obtain relief from this court for being so barred?

II
Is the corporate structure, i.e., the board of directors, board of trustees and their election legal and consistent with the statutory mandate?

III
Has the YWCA been conducted by the defendants in a manner consistent with and contemplated by the expressed objects in the certificate of incorporation, including herein the type of program adopted, the activities sponsored and barred by the defendants, and the operation of a "hotel and restaurant"?

IV
Are the plaintiffs entitled to an accounting by the individual defendants of the affairs of the corporate defendants?
The facts in connection herewith are as follows:
The defendant YWCA was incorporated in 1915 under an act entitled "An Act to incorporate associations not for pecuniary profit," P.L. 1898, p. 422, now known as R.S. *90 15:1-1 et seq. The certificate of incorporation itself is very brief, but provides, in part, as follows:
"(2) The purpose for which said corporation is formed is the improvement of the spiritual, intellectual, social and physical condition of young women."
(4) The number of trustees shall be five."
A constitution and by-laws were adopted for "Young Women's Christian Association of Atlantic City, N.J." For the purpose hereof, these will together be considered as by-laws. See Leeds v. Harrison, 7 N.J. Super., at 571. The constitution contained the following provisions:
"The purpose of the Young Women's Christian Association shall be to associate young women in personal loyalty to Jesus Christ as Saviour and Lord, to promote growth in Christian character and service through physical, social, mental and spiritual training and to become a social force for the extension of the Kingdom of God."
"Section 2. Object. The Object of this Association shall be the spiritual, intellectual, social and physical development of Young Women."
"Section 1. (a) General Members. Any woman properly introduced or giving satisfactory reference as to character, may become a member of the Association."
"(b) In order to conserve the purpose of the Association members shall be classified at the time that payment is made of the Annual membership fee as (1) Active Members, comprising those who subscribe to and will support the purpose and who are members of Protestant Evangelical Churches; these members shall be voting members known as electors."
"Section 1. Duties. The management of this Association shall be vested in a Board of not less than fifteen nor more than twenty-one Directors chosen by ballot from the active members, which shall organize departments and branches, and shall have supervision of all work of the Association, and shall make all contracts and leases."
"Section 2. Elections. One third of the Board of Directors shall be elected by ballot, cast by the active members of the Association, at each annual meeting to serve for a period of three years. The Board shall have the power to fill any vacancy occurring in the interim of annual meetings. Not more than one-third of the Board of Directors shall be members of any one Church denomination."
"There shall be a Board of not less than five Trustees, either men or women, whose terms of office shall be three years. The President shall be ex-officio a member of this Board."
*91 "The membership committee shall have charge of all matters pertaining to membership and it shall seek to increase and hold the membership and develop it into an efficient working force in harmony with the purpose of the Association. It shall keep an accurate list of all members."
A Statement of Faith, which refers to various Biblical quotations, was appended to the constitution and by-laws.
Some of the individual plaintiffs, conceiving that the defendant YWCA did not have a broad enough program to interest the young women of the Atlantic City community, and to attain the objects as set forth in the certificate of incorporation, called a meeting on August 23, 1949, which was attended by representatives of some 19 local women's organizations. At this meeting a committee was appointed to confer with the YWCA officials in order to ascertain what the then program and policy of the YWCA was and to offer assistance in connection with the conduct of the said YWCA.
On August 24, 1949, and prior to any application for membership by the non-member plaintiffs, the board of directors of the YWCA met, at which time the minutes disclose the following action was taken at said meeting:
"Mr. Titzck has advised that we take no new members in for a while stating that we have a perfect right to refuse these women membership in this organization.
Motion made that the Membership Department be closed for the time being because certain people have made it known that they would like to become members of this YWCA in order to change the policy and purpose of the YWCA of Atlantic City in opposition to our constitution which states: `Article II, Section 1. (a) General Members. Any woman properly introduced or giving satisfactory reference as to character, may become a member of the Association. (b) In order to conserve the purpose of the Association members shall be classified at the time payment is made of the Annual Membership fee as (1) Active members, comprising those who subscribe to and will support the purpose and who are members of Protestant Evangelical churches; these members shall be voting members known as electors; (2) Associates, comprising all others not Active members, who wish to identify themselves in interest and service for the Association.' Upon vote, this motion was unanimously carried.
It was pointed out that churches coming under the category of Protestant Evangelical churches were: Episcopal, Methodist, Presbyterian, *92 Baptist, Reformed Episcopal, Orthodox Friends, Brethren and Evangelical."
On September 8, 1949, the non-member plaintiffs made application for membership in the YWCA. By letter dated September 15, 1949, they were directed to appear individually at the YWCA building for the purpose of having their applications then considered.
At some time prior to this latter date, Mrs. Harrison, the president of the defendant YWCA, and Miss Richey, the chairman of the social and membership committee and a paid employee of the YWCA, concluded that a committee of three should interview the individual applicants. Although the membership committee consisted of 25 members, the special committee appointed by Mrs. Harrison, with the consent of the executive committee, consisted of Miss Richey, Mrs. Eshbach, a member of the membership committee ex officio by virtue of her being vice president of the YWCA, and Mrs. Park, a member of the membership committee. At this interview, each of the 12 non-member plaintiffs and a Mrs. Bartholomew were separately interviewed. They were then asked questions which had been typewritten in advance, a copy of which questionnaire follows:
"Ask for specific Church membership
Where attending now (in pencil writing)
1. Can you honestly state that you will subscribe to and support the purpose of the Y.W.C.A. of Atlantic City as set forth in its Constitution and By-Laws, to wit: `The purpose of the Young Womens Christian Association shall be to associate young women in personal loyalty to Jesus Christ as Saviour and Lord; to promote growth in Christian character and service through physical, social, mental and spiritual training and to become a social force for the extension of the Kingdom of God?'
2. Are you willing to advance the purpose of the Association by your consistent personal life which is one of the duties of members as set forth under Article II, Section 6 of the Constitution and By-Laws?
3. In the event the Membership Committee determines you cannot qualify as an active voting member, do you still want to identify yourself in interest and service for the Association as an associate member?"
*93
 "Turn to Mrs. Eshbach  will you ask
 them to sign the paper.
Really too busy for discussion or answering questions now, we have a form of precedure which we want to adhere to this morning 
Don't take $1.00 till accepted."
By letter dated October 13, 1949, each of said applicants was advised that she was denied a voting membership but was informed that she could become an associate member. No reason was given in this communication for the refusal to admit them to full membership. Miss Richey testified at considerable length from notes made by her at the above referred to interview why the several applicants were denied a voting membership. Her statement in each instance, with very little variation, was as follows:
"* * * We felt that she wouldn't be a worker in harmony with the purpose of the organization."
None of the individual defendants testified that any rejected applicant was refused membership because she did not have the qualifications for membership set forth in the statute and the certificate of incorporation, nor that she did not give "satisfactory reference as to character."
I find as a fact, from both the testimony and conduct of defendants' witnesses, that the lack of "harmony" denoted a disagreement by the non-member plaintiffs with the religious convictions of the defendants, upon which religious convictions said defendants had bottomed their program.
In only two instances, that of Daphne Leeds and Helen Parrish, was the refusal of membership stated as being that the applicants were not members of Protestant Evangelical churches. These applicants were respectively members of the Unitarian Church and the Hicksite Society of Friends. The three interviewing members testified that no applicant was denied membership because she refused to sign a "Statement of Faith," although a great number did so sign said "Statement of Faith." It was quite apparent, and I find as a fact, that the 13 applicants who then appeared were denied *94 membership primarily because they held Christian Protestant beliefs different from defendants; not because they were not in harmony with the objects of the YWCA as expressed in the certificate of incorporation, i.e., "the improvement of the spiritual, intellectual, social and physical condition of young women," but rather because they did not agree with the program by which these objectives were to be accomplished.
All of the defendants' witnesses admitted that the 13 applicants were of good moral character and reputation. As a matter of fact, there is no question in my mind that all of the plaintiffs and all of the defendants are of good moral character and outstanding citizens of this community.
Much proof was taken concerning the activities of the YWCA upon which no comment will be made, except to mention that the number of members of the YWCA in 1950 was 962, while the YMCA had over 700 female members of comparable age. I am satisfied that all of the objects as above expressed were attempted to be accomplished, although the greatest stress was laid upon the spiritual. This became self-evident during the trial.
The argument of counsel, hereafter adverted to, that this is a religious body, adds to and augments the conclusions derived from the testimony and the attitudes of defendants' witnesses.
Preliminary to the discussion of the propounded questions, it becomes necessary to determine under what act of the Legislature this corporation is incorporated and functions.
This inquiry is made necessary because of defendants' amended answer, which alleges that by virtue of P.L. 1915, chapters 149 and 150, pages 275 and 276, which are amendatory of "An Act to Incorporate Trustees of Religious Societies," approved 1875 (Revised Statutes 1875, page 121, hereafter referred to as the Religious Society Act), the YWCA came under the operation of said Religious Society Act. The certificate of incorporation of the YWCA recites that it is incorporated under "An Act to incorporate associations not for pecuniary profit," as approved April 21, 1898, *95 (hereafter referred to as the Non-Pecuniary Profit Act). The incorporation of the YWCA preceded the effective date of said first above-referred to acts by less than one month. They argue that although the said two amendatory acts refer in their titles and bodies to the Religious Society Act, that (1) the clear intent was to amend the Non-Pecuniary Profit Act, insofar as Young Women's Christian Associations incorporated under the Non-Pecuniary Profit Act are concerned, as is evidenced by a reference in the body of the said acts to Young Women's Christian Associations, and (2) the validating provision of P.L. 1915, chapter 150, paragraph 3 causes this result, and (3) although incorporated under the Non-Pecuniary Profit Act, the YWCA is a religious corporation.
At the time of the incorporation of the defendant YWCA there was no special statutory provision for such a corporation, although a special statute did exist under which Young Men's Christian Associations could be incorporated (Revised Statutes 1875, page 121, et seq., hereafter referred to as Religious Society Act). The incorporators saw fit to incorporate under the Non-Pecuniary Profit Act. It would seem clear that the Legislature sought by the amendatory acts to make the special provisions of the YMCA act available to individuals who desired thereafter to incorporate Young Women's Christian Associations and to validate such latter corporations as had been erroneously incorporated under the YMCA act.
To accord any other result to the said amendatory acts would not only result in a stilted and unnatural interpretation but would violate Article IV, Section VII, paragraph 4 of the New Jersey Constitutions of 1844 and 1947, since the title of the amendatory acts does not express any other purpose than to amend the Religious Society Act.
The amendatory acts are not, in any event, self-executing, as stated by defendants, but require affirmative action on the part of a corporation to implement them and make them applicable to such corporation. Even though it were conceded, *96 for the sake of argument, that these acts do apply to the corporate defendant, still it must fail in its contention that it has the powers granted by the Religious Society Act, since it did not comply with the mechanics of the procedural affirmative steps required by the amendatory acts for their adoption.
Defendants argue that the YWCA is a "religious" society, giving to that word not only its common connotation, but a meaning which would, by indirection, bring it within the purview of the title "Religious Societies" of the Compiled Statutes, and of Title 16 of the Revised Statutes entitled "Corporations and Associations, Religious." They stress, for this purpose, the inclusion of the word "Christian" in the title of the corporation, and of the word "spiritual" in the certificate of incorporation. They ignore the fact that there was in existence at the time of incorporation only one act under which the YWCA could have incorporated. By this devious means they seek to justify some of their questioned conduct as being permitted corporations expressly incorporated under the Religious Society Act. The difficulty with such reasoning lies in the fact that the compilers of both revisions included the specific statutes under particular headings as a matter of convenience. Such classification neither adds to nor detracts from the act itself. There is a presumption against a legislative intention, by revision of general laws, to effect a change in substance. Crater v. County of Somerset, 123 N.J.L. 407 (E. & A. 1939). The rationale of such an argument, if followed to its natural conclusion, would result in all corporations with the title "Finance" being deemed banking corporations. This is pure sophistry. There is no merit to this contention of defendants.
I conclude, therefore, that the YWCA is governed by the provisions of the Non-Pecuniary Profit Act, solely.

I
Were the 12 named individual non-member plaintiffs legally denied membership in the defendant YWCA and do they or *97 the member plaintiffs have the right to obtain relief from this court for being so barred?
The question of the right of defendants generally to limit membership in the YWCA to members of designated Protestant Evangelical churches will first be considered.
The rules applying to the right of members in an unincorporated association to exclude any one from membership are not here applicable, both for the reasons set forth in Leeds v. Harrison, supra, and as well for those hereafter set forth.
A corporation has the power to adopt by-laws, but only such as are consistent with the law under which it was incorporated and the certificate of incorporation itself.
A corporation exists only under legislative fiat. Its certificate of incorporation is restricted by the powers and duties conferred by the particular act under which it was incorporated. It is limited in its conduct to such functions and duties as are expressly granted by the terms of such act or necessarily incident thereto. The statute is its basic source of power and authority. In case of a conflict, the certificate of incorporation must give way to the superior authority of the statute.
By the same token, although a corporation has the power and authority to adopt by-laws, these must as well be consistent not only with the statute as the source of the paramount grant of power and duty, but also with the certificate of incorporation, which also acts as a check upon this power. A by-law generally can neither enlarge the rights and powers conferred by the certificate of incorporation nor restrict the duties and liabilities specially conferred thereby, and in case it attempts to so do, the certificate of incorporation will prevail. This does not apply to matters incidental to purposes expressed in said certificate of incorporation. If the by-laws conflict or are inconsistent with either the statute or the certificate of incorporation they must fail. 1 Fletcher Cyclopedia of Corporations, pp. 492, 697, 723; Grupe v. Rudisill, 101 N.J. Eq. 145 (Ch. 1926-1927); In re United *98 Towns B. & L. Assn., 79 N.J.L. 31 (Sup. Ct. 1909); State, ex rel. Mutual Benefit Life Ins. Co., pros. v. Utter, Receiver, &c., 34 N.J.L. 489 (E. & A. 1869); Taylor v. Griswold, 14 N.J.L. 222 (Sup. Ct. 1834); In re Brophy, 13 N.J. Misc. 462 (Sup. Ct. 1935).
"The by-laws of a corporation are the permanent and continuing rules adopted by it for its own government and that of its officers and members. They must be consistent with the terms and spirit of the corporate charter, and obviously cannot confer powers upon a corporation or enlarge such as are given by the laws under which it is organized or by its charter. If a corporation is without power to do an act or make a contract directly, it cannot accomplish the same purpose by indirection through the devise of a by-law. However, a corporation may undoubtedly, in its by-laws, provide safeguards, restrictions and limitations on the exercise of its powers."
6 Fletcher Cyclopedia of Corporations, p. 283.
The limitation of the power to exclude any person from membership in a corporation has been stated in 12 Fletcher Cyclopedia of Corporations, p. 972, as follows:
"A corporation, however, has no power to exclude persons from membership in violation of its charter or enabling act, or to enact by-laws as to the admission or qualification of members which conflict with its charter or the general law, or its articles of association, or which are contrary to public policy."
A by-law prescribing a religious qualification for membership in a society, the articles of incorporation of which are silent on the subject, cannot be sustained. People v. Young Men's, etc., Society, 41 Mich. 67, 1 N.W. 931.
Both the member and non-member plaintiffs bear a dual relationship to the YWCA. They have (1) the same relationship as stockholders to a stock corporation, and (2) because of the nature of the corporation, have the relationship of cestuis que trust to the corporate defendant (trustee). Discussion of the right to bar certain cestuis que trust from participation in a charitable trust will follow later.
Defendants argue that the inclusion of the word "Christian" in the title of the corporation, and "spiritual" in *99 the certificate of incorporation, gives the implied power to restrict its membership to Christians of certain denominations, and that the provision in the statute, which reads as follows:
"The certificate of incorporation may prescribe the qualifications of officers and members. It may require them to be members in good standing of a fraternal, religious or beneficiary order or society or of a fire or police force or to have other prescribed qualifications, which provisions shall be binding on the officers and members. The certificate may contain other provisions for the regulation of the business and conduct of the affairs of the corporation, and any limitation or regulation of the powers of the corporation and of its officers and members not inconsistent with law or the provisions of this title." R.S. 15:1-2. (Italics supplied.)
authorizes the adoption of a by-law restricting the membership. The fallacy in this advanced theory is that the basic power of the corporation is derived primarily from the statute, and secondarily from the certificate of incorporation. The mere inclusion of a descriptive word in the title of the corporation incorporated under the General Corporation Act, R.S. 14:1 et seq., or the Non-Pecuniary Profit Act, does not add anything to its powers. The certificate of incorporation contains, by its express provisions, those powers. The use of the word "spiritual" in the statement of the objects does not, incidental thereto, especially in view of the statute to which we have above adverted, authorize such restrictions as were imposed.
Although the statute does not, in express language, prohibit restriction of membership to those persons in designated Protestant Evangelical churches by the by-laws alone, such prohibition is implicit in the affirmative provision that such a restriction "may" be embodied in the certificate of incorporation. The express direction or mandate of the statute to so include any such restriction in the certificate of incorporation is tantamount to a direction that the restriction shall be there solely expressed and that such a qualification shall not be included in the by-laws unless provided for in said certificate of incorporation. The word "may" as used in *100 the statute grants a permission to so include a restriction, but by the same token makes it mandatory for the inclusion of such a restriction in the certificate of incorporation, to be legally efficacious. Upon failure to so provide in the certificate of incorporation, the corporation has no authority to limit or restrict its membership. It would be inconsistent with legislative intent to permit the limitation to be imposed in the manner in which it was here done. Fogg v. Ocean City, 74 N.J.L. 362 (Sup. Ct. 1907). The word "may" as here used, as gathered from the entire context of the statute, is permissive insofar as the power to limit is concerned, but mandatory insofar as the requirement that it be included in the certificate of incorporation is concerned. The effect of the word "may" in statutory construction must be gathered from the entire context of the law. Winne v. Cassale, 99 N.J.L. 345 (Sup. Ct. 1923).
The restrictions contained in the by-laws limiting membership to members of Protestant Evangelical churches and the listing of specific churches as qualified by such expression is violative of and inconsistent with the statute and certificate of incorporation, and is therefore a nullity.
In addition to the relationship of a stockholder to a corporation, these plaintiffs bear the relationship of cestuis que trust to the corporate defendant. This is a charitable corporation. Leeds v. Harrison, 7 N.J. Super. 558 (Ch. Div. 1950). Although in a strict sense a charitable corporation is not a charitable trust, for present purposes the same principles are applicable. 3 Scott on Trusts, p. 1918.
In Larkin v. Wikoff, 75 N.J. Eq. 462 (Ch. 1909), affirmed 77 N.J. Eq. 589 (E. & A. 1910), the court said:
"The cestuis que trustent are those for whose benefit others are seized of real or personal property. 1 Bouv. Dict. (Rawle's Rev.) 302. The cestui que trust is the real, substantial and beneficial owner of an estate which is held in trust as distinguished from the trustee in whom the mere legal title is vested. 28 Am. & Eng. Encycl. L. (2d ed.) 1100. In the case under consideration the cestuis que trustent are all the people of the neighborhood of the Cedar Grove church."
*101 See also Leeds v. Harrison, supra; YWCA of Camden v. Murrelle, 141 N.J. Eq. 229 (Ch. 1948); 3 Scott on Trusts, p. 2046.
The funds for the erection of the elaborate building containing some 150 sleeping rooms, gymnasium, swimming pool, club rooms, cafeteria, and an auditorium, were obtained by popular subscription and contribution. The corporation enjoys a tax exemption. These special privileges were obtained by reason of its avowed purposes.
Although the defendants may concededly make certain requirements for membership, not contrary to law, they cannot arbitrarily bar cestuis having the qualifications legally specified by the statute and certificate of incorporation. They can, as well, not bar from the benefits of the charity cestuis having said qualifications.
The non-member plaintiffs, for whom the Attorney-General appeared, are part of the cestuis que trust of this charitable corporation. The corporation is vested with a public interest and duty. The non-member plaintiffs, as cestuis, have an interest in the trust. As such cestuis que trust they have a right to the aid of the court in the supervision of the trust and the enforcement of their rights to participate in that capacity. They are entitled to participate. To say that they could receive associate membership is no answer. If they have the qualifications required by the statute they are entitled to actively participate in both the activities and the conduct of the corporation. They are entitled to something more than a participation in a program already established, but circumscribed and limited by the religious beliefs of defendants.
For these reasons, the defendants may not arbitrarily exclude the non-member plaintiffs from the benefits of the charity, and they have the right to have their interests protected through the Attorney-General.
The member plaintiffs have an additional basis to demand relief if they have been wronged by the act of the defendants. This being a non-stock corporation, the members *102 stand in the place of stockholders in a stock corporation and have the same rights in relation to the corporation and other members, as stockholders of the latter corporation have.
The statute under which the corporation was incorporated, the certificate of incorporation, constitution and by-laws of a corporation constitute a contract between the corporation and the members, as well as between the members inter sese, and the trustees or directors bear a fiduciary relationship to the members which requires them to comply with said statute, certificate of incorporation and by-laws. Leeds v. Harrison, supra, and cases there cited.
Implicit in that contract is the agreement that the corporation will function as the statute and certificate of incorporation require, both insofar as the corporate structure, i.e., the provisions for the number, class and election of officers, directors and trustees, are concerned, and insofar as the accomplishment of the objects and the admission to membership and benefits of new members are concerned. This includes the right to have this court prevent arbitrary rejection of new members who have the qualifications set forth in the applicable statute, certificate of incorporation and the by-laws, by defendants, at the suit of a member.
In view of the foregoing, it becomes necessary to consider whether the non-member plaintiffs have been arbitrarily denied membership.
The defendants have listed the following reasons in their brief for denying such plaintiffs membership:
"1. They had signed Exhibit D-1 demanding resignation of directors and officers.
2. They had declared their avowed intention of seeking membership to change the policy and program which had been conducted for at least the last 20 years.
3. Some had not been properly introduced.
4. Because they had no knowledge of the work of the Y.W.C.A. of Atlantic City and had never previously taken any interest until suddenly applying in a group, after severely criticizing the association.
5. Because in view of all their actions, they would not be desirable members of an efficient working force of the members of the *103 association as a whole, in harmony with the purpose of the association, as expressed in the charter, constitution and bylaws."
Assayed in the light of the testimony and the attitude of defendants' witnesses, this reduces itself, in truth and fact, to a divergence of opinion on Christian Protestant beliefs. The harmony referred to means a divergence of opinion on Fundamentalism.
Only two applicants were refused membership because they were not members of Protestant Evangelical churches, and none was rejected for failure to give satisfactory reference as to character. It must be, therefore, irrebuttably presumed that at least 11 applicants had all of the qualifications set forth in the statute, certificate of incorporation, constitution and by-laws, regardless of whether those qualifications contained in the latter two instruments were legally adopted.
The defendants assumed the attitude that they alone were the final arbiters of the manner in which the corporate objectives were to be accomplished and that only they and those in accord with their beliefs were to enjoy the benefits of the charitable trust. In actuality, they have barred from participation in and enjoyment of the assets of the charitable corporation all who have been guilty of a disagreement on Christian Protestant dogma. Although, as heretofore set forth, their program contemplated the accomplishment of all four objectives, it was self-evident throughout the trial that the major portion thereof was directed at religious instruction. The continued insistence of the defendants during the trial of infusing a religious issue substantiates further the conclusion that they were primarily concerned with a particular group of Christians and the propagation and instruction of the tenets and belief held by them. The defendants, in the language of Mrs. Harrison, were "unique" Christians and the plaintiffs were "carnal" Christians. They stress the "spiritual" object in the certificate of incorporation and insist that the other three objects shall be subservient to their conception and interpretation of the word "spiritual." To that word they give the significance of their own beliefs, forgetting *104 the broad sense in which all the words expressing the objects were employed. Having once gained control of the YWCA, they conscientiously conceive that they have the right to bar any member of the public from membership under the guise here employed, although she may be entirely in accord with the objectives, if her particular religious beliefs are not the identical religious beliefs of the defendants. Having once gained control of the YWCA they feel that they have a proprietary interest therein and a right to perpetuate themselves in office and further their religious beliefs by only permitting new cestuis to become members who have identical ideals. Actually, although apparently fostering all four objectives, their true mental attitude is further shown by their consideration of the change of name of the YWCA to a "Bible" society. They are still attempting to restrict the beneficiaries to a limited number of Protestant Evangelical churches by arbitrarily denying membership to new applicants who are members of some other religious order or society by the subterfuge here resorted to. They are attempting to so restrict membership and beneficiary cestuis to specified religious orders or societies, by indirection, i.e., by a means not permitted and in violation of the Non-Pecuniary Profit Act and the certificate of incorporation. They ignore the fact that this is a charitable corporation, having received contributions from the general public, who are entitled to participate as cestuis. They do not deny the moral character of the plaintiffs. Basically, this question involves the determination of whether a certain group of cestuis can gain control of a public charitable corporation formed for the purposes above set forth and exclude all other cestuis from the avowed benefits of such purposes, solely because the latter may disagree with certain tenets and beliefs held by said group, not legally required for such participation.
The defendants cannot, under the law, arrogate unto themselves the selection of a limited class to enjoy the benefits of the YWCA as cestuis. This is not a question of personal like or dislike, personal agreement or disagreement with religious *105 interpretation of the Bible. The defendants have an obligation to admit to membership, participation and benefit, upon an impersonal standard as members and cestuis que trust all who have the statutory qualifications.
As further evidence of the arbitrary position of the defendants, reference is here made to the minutes of August 24, 1949, which demonstrate a determination to preclude the public generally from membership and to prejudge their qualifications.
What has been here said is not to be deemed a criticism of the beliefs or sincerity of the defendants. I am not called upon, nor do I determine the propriety of these defendants' beliefs. They are sincere in their position that the benefits of the YWCA and its building shall be enjoyed only by those of their personal selection.
I find as a fact that the non-member plaintiffs had all of the legally required qualifications for membership and that the defendants arbitrarily denied membership to the non-member plaintiffs and denied to them as cestuis the benefits under the trust to which they were entitled.
Both the member and non-member plaintiffs are entitled to a judgment to the effect that the non-member plaintiffs be admitted to membership.

II
Is the corporate structure, i.e., the board of directors, board of trustees and their election legal and consistent with the statutory mandate?
What has been above stated concerning the right to redress in this court for denial of membership is as well applicable to the corporate structure of the YWCA. The corporate structure was illegal, since it was not in compliance with the Non-Pecuniary Profit Act and the certificate of incorporation. The mode of election was illegal, since it was not in compliance with the by-laws.
Judgment will be entered for member plaintiffs accordingly.

*106 III
Has the YWCA been conducted by the defendants in a manner consistent with and contemplated by the expressed objects in the certificate of incorporation, including herein the type of program adopted, the activities sponsored and barred by the defendants, and the operation of a "hotel and restaurant"?
I am satisfied that the program as adopted by the defendants was within the purview of the statute and certificate of incorporation. So long as the said YWCA was being conducted within the confines of said objects, this court does not have the power, the authority, nor the time to determine the intimate details of a program. I am not concerned with whether the program refused to permit dancing, smoking and card-playing, nor am I concerned with what percentage of the program dealt with the spiritual, intellectual, social and physical condition of young women, so long as all four objects were to some extent being accomplished.
It is here held that regardless of the opinion of the plaintiffs as to the manner in which the objects should be accomplished, so long as the defendants are attempting to accomplish said objectives they are guilty of no legal violation for which redress may be had. The power to change the program and the officers lies within the framework of the membership itself, and the manner in which the objects are attained is to be left exclusively to said members.
The plaintiffs have as well complained that the program is not that of the average YWCA. I cannot establish any norm as a basis for guidance. I am not concerned with what any other YWCA may do. I am concerned solely with whether the activities of the defendant corporation are violative or in furtherance of its objects as expressed in the statute, its certificate of incorporation and the legal provisions of its constitution and by-laws. The intimate details or mode of approach to the accomplishment of that end is entrusted to duly elected officers and trustees.
*107 I find that the operation of a hotel and cafeteria is not illegal. The complaint will be dismissed insofar as this demand for relief is concerned.

IV
An accounting by the individual defendants of the affairs of the corporate defendants.
The defendants have had an annual audit and have submitted an annual accounting to which its members have had access. They have tendered themselves willing to submit these to be examined by its members at any reasonable time. In view thereof, there is no need for the relief demanded under this heading. The complaint will be dismissed insofar as this demand for relief is concerned.
I find there is no merit to the defense of laches and acquiescence. Time does not, of itself, lend dignity and legality to an otherwise illegal act. There must be something more present to make such a defense available. The delay must be unreasonable under the circumstances and prejudicial to the defendants. These elements are lacking. Hinners v. Banville, 114 N.J. Eq. 348 (E. & A. 1933).
As to other grounds for relief and defenses, I find them without merit.