125 N.J. Super. 302 (1973)
310 A.2d 518
ELMO G. VALLE AND ODETTE SCHIELKE, PLAINTIFFS,
v.
NORTH JERSEY AUTOMOBILE CLUB, A MUTUAL ASSOCIATION INCORPORATED IN ACCORDANCE WITH TITLE 15 OF THE LAWS OF THE STATE OF NEW JERSEY, AND FLOYD HUGHES, ALEXANDER PATTERSON, PETER CALCIA AND WALTER D. VAN RIPER, AS OFFICERS AND DIRECTORS OF NORTH JERSEY AUTOMOBILE CLUB, AND FLOYD HUGHES, ALEXANDER PATTERSON AND PETER CALCIA, INDIVIDUALLY, AUTO CLUB AGENCY OF HUDSON COUNTY, A CORPORATION OF THE STATE OF NEW JERSEY, DONALD HUGHES, ALEXANDER PATTERSON, JR., WILLIAM HOLLRITT AND CARLETON H. RITTER, DEFENDANTS. WILLIAM RICCARDO, PLAINTIFF-INTERVENER,
v.
JAMES T. WHITE, DEFENDANT ON COMPLAINT OF INTERVENER.
Superior Court of New Jersey, Chancery Division.
Decided August 24, 1973.
*305 Mr. Howard Stern, of counsel, argued the cause for plaintiffs Elmo G. Valle and Odette Schielke (Mr. A. Crew Schielke, Jr., attorney).
Mr. Walter D. Van Riper argued the cause for defendant North Jersey Automobile Club (Messrs. Van Riper, Belmont and Villanueva, attorneys).
Mr. John B. Hall argued the cause for plaintiff-intervenor William Riccardo.
Mr. Albert S. Gross argued the cause for defendants Floyd Hughes, Alexander Patterson, Peter Calcia, Walter D. Van Riper, Auto Club Agency of Hudson County, Donald Hughes, Alexander Patterson, Jr., William Hollritt and Carleton H. Ritter, and for defendant James T. White as defendant on complaint of intervenor.
KOLE, J.S.C.
Plaintiffs challenge the organizational procedures of North Jersey Automobile Club ("NJAC" or "club"), essentially on the ground that as members they have been foreclosed from a voice in the election of directors as a result of certain by-law provisions. Additionally, plaintiffs attack the acquisition in December 1951, over 20 years ago, of the Fletcher Insurance Agency, now Automobile Club Agency of Hudson County ("Hudson"), by four of NJAC's directors and the operation thereof for the benefit of the directors until November 1971. At that time, while this action was pending, Hudson was turned over by the directors without compensation to NJAC. With respect to the latter *306 claim, plaintiffs seek an acounting of the profits derived from Hudson and the removal of the directors who have so profited.
Defendant NJAC is a nonprofit membership corporation organized under Title 15 of the New Jersey Statutes and operating under a franchise from the American Automobile Association. Its essential object is to provide automobile road service and travel information to its membership which presently totals over 100,000. For such benefits the member pays an annual fee and agrees to be bound by the charter and by-laws of NJAC.
Plaintiffs are all members of NJAC. Elmo Valle had been a member since 1952, for over 18 years when this suit was started. He served as a director from 1965 to 1970. He has also been retained as an accountant by both NJAC and HUDSON. Odette Schielke has been a member of NJAC from 1969. William Riccardo, a member since 1965, was granted leave to intervene as a plaintiff after the action had been commenced by the two above-mentioned plaintiffs, seeking substantially the same relief.

I

THE FORM OF THE ACTION
This action was designated as a class action under R. 4:32-1 by order dated January 31, 1972, with Riccardo representing the class of members of NJAC. After the close of all the evidence, defendants challenged this designation insofar as the action involves an alleged breach of duty by certain directors of defendant NJAC. Defendants contend that this portion of the action must properly be viewed as a shareholder's derivative suit.
Prior orders in a case are, of course, normally considered "the law of the case" and are not lightly modified or set aside. In the present situation, however, R. 4:32-2(a) specifically provides that an order determining the maintainability *307 of a class action may be altered or amended before the decision on the merits.
In considering the merits of defendants' contention it must be recognized that there is a real substantive difference between a derivative cause of action by shareholders to enforce derivative or secondary rights under R. 4:32-5 and a claim asserted in a class action to enforce primary rights under R. 4:32-1 to 4:32-4, inclusive.[1] In the former the alleged wrong was committed against the corporate entity. Any recovery by the representative plaintiff inures to the corporation's benefit, not the plaintiff's. In the class action the representative plaintiff has been directly harmed and sues to redress his grievance and those of all shareholders similarly situated. An example of this latter category is the action which arises when a class of preferred stock has been wrongfully redeemed. The holders of such stock are directly affected. They may sue individually or through a representative in a class action. Conversely, the most common example of a derivative cause of action is wrongdoing by directors or officers that is alleged to have depleted the corporate treasury in some way. The cause of action belongs to the corporation, not the shareholders. As the wrongdoing officers usually are in control of the corporation, enabling them to suppress any corporate effort to remedy such wrong, equity has permitted shareholder derivative suits to prevent a failure of justice. See 13 Fletcher Cyc. Corporations (perm. ed. 1970), § 5908 et seq., at 279 et seq.; 3B Moore's Federal Practice, § 23.1.16(1); Weiner v. Winters, 50 F.R.D. 306 (D.C.S.D.N.Y. 1970); Publishers Appendix 3, "Advisory *308 Committee's Note to Federal Rule on Class Action," N.J. Court Rules (1972 ed., Gann, at 981-982).[2]
That part of the present action which alleges a breach of trust by defendant directors in acquiring and operating Hudson and seeks their removal therefor seems clearly to involve a cause of action which reposes in the corporation NJAC, not its members. No individual member or class of members has been directly injured. Rather, defendants are said to have wrongfully usurped a "corporate opportunity." In such a case there can be no doubt that the cause of action is primarily that of the corporation.
Accordingly, I conclude that the breach of trust allegations made by plaintiffs constitute a derivative claim and should not have been allowed to proceed as a class action. For purposes of this decision, then, the claim must be considered as having been brought in the form of a shareholder's derivative suit under R. 4:32-5.
R. 4:32-5, "Derivative Action by Shareholders," provides as follows:
In an action brought to enforce a secondary right on the part of one or more shareholders in an association, incorporated or unincorporated, because the association refuses to enforce rights which may properly be asserted by it, the complaint shall be verified and allege that the plaintiff was a shareholder at the time of the transaction of which he complains, or that his share thereafter devolved on him by operation of law. * * *
There can be no question but that the term "shareholder," as employed in R. 4:32-5, includes a "member" of *309 a nonprofit corporation who seeks to proceed on a derivative cause of action. Leeds v. Harrison, 7 N.J. Super. 558, at 570 (Ch. Div. 1950), rev'd on other gds., 9 N.J. 202 (1952). See also, Escoett v. Aldecress Country Club, 16 N.J. 438 (1954), wherein another provision of the derivative suit rule (then R.R. 4:36-2) was in issue. Implicit in the determination of the case on the merits is that the rule is applicable to "members" as well as shareholders.[3]
Although one of the purposes of the rule requiring the plaintiff to be a shareholder or member at the time of the transaction of which he complains is to prevent "strike" or nuisance suits against corporations by persons acquiring stock or membership for that purpose, other equitable considerations enter into a determination of whether and the extent to which it should be applied in a given case. Thus, the fairness to all the parties, including the corporation, under the circumstances of permitting a stale claim as to a wrongful transaction by directors occurring many years before plaintiff acquired his interest; laches by plaintiff; unclean hands on the part of plaintiff; the nature of the wrong involved; whether the directors then or thereafter acted in good faith; whether the corporation has obtained benefits from the transaction between its occurrence and plaintiff's acquisition of membership which in a substantial degree may offset the wrong involved therein;[4] the difficulties of *310 proof of such matters as, for example, the amount of damages suffered by the corporation; whether the application of the rule would violate the general policy against procedural frustrations of determinations on the merits implicit in the philosophy of the court rules, and whether failure to apply the rule would involve an inequitable or unjust result  these, among others  are factors to be evaluated by the court in deciding whether the rule should or should not be applied. See Bookman, supra, 138 N.J. Eq. at 372-373, 398, 405-407; Escoett, supra; Amabile, supra; Hill Dredging Corp. v. Risley, 18 N.J. 501, 530-532, 536-537 (1955); Endicott v. Marvell, 81 N.J. Eq. 378 (Ch. 1913), aff'd 83 N.J. Eq. 632 (E. & A. 1914); Solimine v. Hollander, 128 N.J. Eq. 228, 246 (Ch. 1940). Cf. Crescent Pk. Tenants Ass'n v. Realty Eq. Corp., 58 N.J. 98, 107-108 (1971).
In the present case the transaction of which plaintiffs complain is the purchase of Fletcher's insurance agency in 1951 by four of the defendant directors and the operation of that business by and for the benefit of such directors from 1951 until November 1971.
The original plaintiff in this action was Elmo Valle. He was and is the only plaintiff to have been a member prior to 1965.
For the reasons hereafter given, Valle is barred from bringing the derivative action on behalf of the NJAC against such directors because of laches, unclean hands or both.
Unless there are special circumstances warranting an exception from R. 4:32-5, therefore, the derivative action is without a proper representative plaintiff under that rule *311 for the conduct complained of for the period 1951 to 1965. I find, as hereafter set forth, that there are no reasons to carve out any such exception in this case. The other representative plaintiffs are Riccardo, who became a member of NJAC in 1965, and Odette Schielke, who did not become a member until 1969.
[The court then considered plaintiffs' claim that an exception to the contemporaneous ownership-membership rule exists when the conduct complained or was of a continuing nature and did, in fact, continue after the plaintiff became a shareholder or member. The court observed that there was conflicting authority under the Federal Rules of Civil Procedure, after which R. 4:32-5 is patterned, as to whether such an exception exists, and no authority under the New Jersey rule.[5] Noting that a continuing-wrong exception might be desirable in some situations, the court concluded that on the facts of this case there was no compelling reason to find such an exception applicable. Rather, the court found that, based on the factors heretofore referred to, complete justice and equity could be done in this case by considering Riccardo, who became a member in 1965, as the plaintiff in the derivative action, allowing recovery against defendant directors from the date of his membership.
*312 Insofar as plaintiffs' complaint was addressed to the electoral procedure within NJAC, the court found the action to have been properly designated a class action under R. 4:32-1 to 4:32-4, citing Lusky v. Capasso Brothers, 118 N.J. Super. 369 (App. Div. 1972), certif. den. 60 N.J. 466 (1972), and R. 4:32-2(d).]

II

BREACH OF TRUST
[The court found the four NJAC directors who had purchased the Fletcher Agency in 1951 and operated it as a virtual department of NJAC from 1951 through 1971, guilty of a breach of fiduciary duty. It found that they were not guilty of actual fraud; in good faith, though erroneously, they believed their breach of trust had been ratified by NJAC's members. They were ordered to pay to NJAC the sum of Hudson's earnings accrued for or distributed to them from 1965 (when Riccardo became a member of NJAC) through 1971  a total of $87,540. They were not removed from office. Plaintiff Valle was found barred by laches and unclean hands as a proper representative plaintiff in the derivative action for breach of trust, but intervener Riccardo was held to be a proper representative plaintiff in both that and the class action.]

III

ELECTION OF DIRECTORS
[With respect to the challenge to certain by-laws of NJAC, the court observed that traditionally courts have been hesitant to interfere with the internal affairs of voluntary associations  intervening only if a statute or public policy was violated or the governing rules worked an unconscionable hardship or contravened natural justice.[6]
*313 Using these standards, the court then analyzed Article IX of the by-laws which vests authority to amend the by-laws in the board of directors.]
Title 15 contemplates that, in addition to the certificate of incorporation, the governing rules of the corporation shall be its by-laws, "which shall be passed by the members." N.J.S.A. 15:1-7, 15:1-4; Leeds v. Harrison, supra, 9 N.J. at 213.
There is neither a prohibition in the statute against, nor express authority for, the members adopting a by-laws provision such as Article IX giving the power of amendment to the board of directors. Compare this situation with the specific statutory authorization for delegation of the amendatory power to the board contained in the former and present statutes governing general business corporations, subject, however, to the reserved power in the shareholders to alter or repeal any such by-law adopted by the board. N.J.S.A. 14:3-2 and N.J.S.A. 14A:2-9(1).
I have concluded that since the only statutory provision here applicable (N.J.S.A. 15:1-7) provides for by-laws "which shall be passed by the members," Article IX would be invalid if read to deprive members of the power to alter by-laws passed by the board. Such a "surrender" of the amendatory power to the board by the members would be contrary to the statute and hence unlawful. See Lo Curto v. River Edge Girl Scouts Ass'n, Inc., 59 N.J. Super. 408 (Ch. Div. 1960); Leeds v. Harrison, supra, 9 N.J. at 211-213, and the trial court opinion which it reversed, 15 N.J. Super. 82, 97-98 (Ch. Div. 1951); Bible Presbyterian, etc. *314 v. Harvey Cedar Bible, etc., 84 N.J. Super. 441, 450 (App. Div. 1964), certif. den. 43 N.J. 258 (1964); Moorestown Management, Inc v. Moorestown Bookshop, 104 N.J. Super. 250, 260 (Ch. Div. 1969); State v. Jefferson Lake Sulphur Co., 36 N.J. 577, 589-591 (1962), app. dism. 370 U.S. 158, 82 S.Ct. 1253, 8 L.Ed.2d 402 (1962). Cf. Bookman, supra, 138 N.J. Eq. at 324-328; Penn-Texas Corp. v. Niles-Bement-Pond Co., 34 N.J. Super. 373 (Ch. Div 1955); 8 Fletcher Cyc. Corp. (Perm. Ed. 1966), § 4185 at 688 et seq.
Similarly, if Article IX were interpreted as a "delegation" to the board of the members' amendatory power, it would appear that such delegation would be contrary to the statute unless viewed as subject to a reserved power in the members to repeal or alter such by-laws as the board might adopt.
[The court then reviewed the history of Article IX since its adoption in 1951, finding it had never been abused and that there was no evidence that the members had ever attempted to exercise their reserved power to amend the by-laws. Absent such a showing, the court held that Article IX must be construed as being consistent with the statute; that is, the members had and still have the authority to repeal or amend any by-laws.
The other challenged by-laws provision was then discussed  Art. V, § 2, providing for nominations of members of the board of directors. In sum, this by-law provides that a nominating committee, appointed by the board of directors, shall make nominations. Other nominations can be made by 5% of the total membership filing a certificate. The signature, residence and membership status of each member signing the certificate is required to be notarized.
The court concluded that the by-law was not objectionable on its face but observed that plaintiffs' principal claim was that in application the effect of the by-law was to deny to members the right to nominate and vote for candidates of their choice because the board controlled the nominating *315 committee procedure and the requirements for other nominations were virtually impossible to meet.]
Defendants consider this by-law as a device to protect the membership. They claim it eliminates the risk of many frivolous nominations which would confuse the membership and render a rational and meaningful choice of directors from among many nominees exceedingly difficult, if not impossible. There is authority for this view of corporate or association management control with respect to provisions restricting independent nominations by members to a percentage thereof. See Stuberfield v. Long Island City S. & L. Ass'n, 235 N.Y.S.2d 908, 916, 918 (Sup. Ct. 1962). But cf. In re Veloso, 93 N.J. Super. 186, 194 (App. Div. 1966), certif. den. 48 N.J. 580 (1967).
Plaintiffs contend that, as NJAC now has over 100,000 members, the by-law requires over 5,000 notarized signatures for such a nomination. Moreover, they contend that those in charge of the records of NJAC would not make available the membership list of the club to a potential candidate. They argue, therefore, that the burden imposed on the membership is virtually impossible of accomplishment, resulting in a de facto denial of the members' freedom to nominate and choose the directors of NJAC.[7]
*316 While there was no evidence that any member ever actually attempted to obtain the requisite 5,000 signatures for a nomination, defendants have not challenged the assertion that such a task would be so burdensome as to render the independent nominating procedure of little practical value. Rather, they take the position that the by-law provisions are valid contractual terms with which the court should not interfere.
I find that defendants have failed adequately to answer plaintiffs' claim for relief insofar as it appeals to public policy, "the ultimate source of justice." Bron v. Weintraub, 42 N.J. 87, 92 (1964). See also In re Veloso, supra.[8]
NJAC had but 651 members at the end of World War II. By the end of 1950 membership was 8,610 and by the close of 1960 it had grown to 39,482. Membership presently is over 100,000. Its membership dues income is now in excess of $1,000,000; its assets exceed $1,000,000.
Yet, by virtue of NJAC's status as a Title 15 nonprofit corporation, it and its management are not regulated or otherwise subject to scrutiny except by its members or, when called upon, a court. Moreover, it must be recognized that the individual member of NJAC does not have the same interest in his corporation's affairs as do shareholders in a corporation for profit. He has no real stake in its management; he has only better service to gain by better management, not money which might be his reward in a corporation *317 operated for profit. If management is poor, he stands to lose only his membership dues for one year rather than what may well be a sizeable capital investment in a business corporation. Thus, it is readily apparent that there is little to motivate any individual member or group of members to keep a close eye on those who manage an organization such as NJAC.
It is in the light of the foregoing considerations that the defendants' reliance on judicial laissez faire must be adjudged an inadequate answer to plaintiffs' claim for relief. As noted by our Supreme Court in a different context, when courts originally declined to scrutinize admission practices of membership associations, they were dealing with social, religious and fraternal organizations. When they were later called upon to deal with the admission or expulsion practices of trade and professional groups involving public policy considerations, judicial relief was provided. Falcone v. Middlesex Cty. Med. Soc, supra, 34 N.J. at 596; Higgins v. American Soc. of Clinical Pathologists, supra.
Changing conditions produce new problems with which the court must deal. These problems often require remolding of the law and the extension of old remedies. In the Matter of the Guardianship of C., 98 N.J. Super. 474, 487 (Cty. Ct. 1967); Ellsworth Dobbs Inc. v. Johnson, 50 N.J. 528, 553-554 (1967).
So it is in the present case. While past court decisions generally may have considered the member-association relationship as purely contractual, that view cannot be permitted to frustrate necessary growth and development of the common law in this area in a proper case based on public policy considerations.
Here, NJAC has grown in terms of assets and membership to a size which defies characterization of the organization as a private club. Its attributes and the character of its activities are much more those of a moderately large business corporation than those of a club or voluntary association. It is *318 in the business of insurance for its members. It provides various services in exchange for annual fees. There is no evidence of the participation by members in club activities that is a common aspect of membership in the usual voluntary association. In sum, except for the somewhat higher fees that would presumably have to be charged to generate profits, NJAC could easily pass for an ordinary business corporation.
It is incongruous that such an organization, which controls substantial income and assets contributed by its members, should be considered and conducted as a small club or should have its electoral process so structured that the persons managing it  its board of directors  may, for all practical purposes, be perpetuated in office. The prospect of possible failure of reelection may help instill in each director a sensitivity to the public trust aspect of his role.
Except for the breach of trust already discussed, I have found nothing in the evidence that would warrant criticism of the present or past management of NJAC by the individual defendants as officers or as members of the board of directors. On the contrary, I have found it to have been a well-managed automobile club.
Nevertheless, the by-laws provisions relating to independent nominations of board members in actuality do not afford "the democratic process of election" that should be required in such a corporation. Cf. In re Veloso, supra, 93 N.J. Super. at 194. Since 5% of the total membership is now over 5,000, the requirement that that number of members file a written certificate of such nominations would appear to be so burdensome as realistically to preclude independent nominations being made. Moreover, the failure of the by-laws to provide a method of seeking out the requisite number of members to sign such a certificate or of communicating the names of any such independent candidates to the members makes the 5,000 members requirement virtually impossible to meet. Unquestionably, there is a valid business *319 reason for not disclosing the list of members. But certainly a by-law provision permitting such a procedure may be devised which is consistent with the need for membership confidentiality.
Again, although there may be good cause to require the certificate of independent nominees to be verified, the provision apparently requiring the signatures, residence and membership status of each of the 5,000 members appearing on the certificate to be verified under oath in practice is patently unreasonable.
[The court concluded that the changes to be made in Art. V, § 2, or in any other by-law provision relating to nominating or election procedures, and in Art. IX (involving by-law amendment procedure) should be effected in the first instance by the NJAC membership. Accordingly, the court ordered that representatives be selected by plaintiff Riccardo, NJAC's board of directors, and the court for a committee which would formulate proposed by-law revisions for membership approval at its meeting in 1974. An election of a new board of directors was ordered to be held subsequent to adoption of the new by-laws by the members and pursuant thereto.
The court rejected plaintiffs' demand that the election of directors of November 2, 1970 and subsequent appointments by the board to vacant seats on the board be set aside. It held that (1) there was insufficient evidence of the irregularities therein charged by plaintiffs, and (2) despite the invalidity of Art. V, § 2, of the by-laws, the evidence did not show that NJAC would be prejudiced by the court's declaring such by-law invalid prospectively and continuing the present directors in office until their successors were elected. Rather, it found that NJAC would be better served by the above-mentioned orderly procedure of revising the by-laws, followed by an election.]
NOTES
[1] As indicated by its being part of R. 4:32 "Class Actions," shareholders' derivative suits are a form of class action in the sense that plaintiff undertakes to be representative of the large group of shareholders not actually before the court. See fn. 2 infra.

However, as used in this opinion, the term "class action" refers to one under R. 4:32-1 to 4:32-4 to enforce primary rights, rather than a derivative action under R. 4:32-5.
[2] R. 4:32 is patterned after Fed. R. Civ. Proc. 23 and 23.1. Comment to R. 4:32, N.J. Court Rules (1972 ed., Gann), at 554.

The difference between the derivative "class" action and the usual class action to enforce primary rights lies in the nature of the rights which plaintiff prosecutes. With this difference lies the reason for the special conditions imposed by R. 4:32-5, when the suit is a derivative action, which are inapplicable when the suit is a class action to enforce primary rights under R. 4:32-1 to 4:32-4. See 3B Moore's Federal Practice, supra; Weiner v. Winters, supra. See also, Pomeroy v. Simon, 17 N.J. 59 (1954).
[3] Cf. Amabile v. Lerner, 64 N.J. Super. 507 (Ch. Div. 1960), aff'd on other gds. 74 N.J. Super. 443 (App. Div. 1962), applying the General Corporation Act standing to sue provision (N.J.S.A. 14A:3-6), as well as the court rule, to a derivative action against a mutual casualty insurance company. The General Corporation Act provision is merely declaratory of the preexisting case law. Bookman v. R.J. Reynolds Tobacco Co., 138 N.J. Eq. 312, 394-400 (Ch. 1946).
[4] The receipt of benefits by the injured corporation from the challenged transaction is, of course, immaterial to the issue of whether a breach of trust occurred. The corporation is entitled to all, not just part, of the benefits. Keely v. Black, 90 N.J. Eq. 439, 444 (Ch. 1919), rev'd on the facts, 91 N.J. Eq. 520 (E. & A. 1920). Nonetheless the existence or absence of substantial benefits to the injured corporation clearly affects the equities of the respective parties on the matter of standing. The effect of the wrongful conduct might have been so offset by collateral benefits to the corporation prior to plaintiff's acquiring an interest in the corporation as to render plaintiff's interest in the injury trifling, in which case the action might not be allowed. See Bookman, supra, 138 N.J. Eq. at 398.
[5] The court cited the following cases relating to the continuing-wrong exception: for the exception: In re Penn Central Transp. Co., 341 F. Supp. 845 (E.D. Pa. 1972); Hoff v. Sprayregan, 42 F.R.D. 243 (S.D.N.Y. 1971); contra: Henis v. Compania Agricola de Guatemala, 116 F. Supp. 223, 228 (D.C. Del.), aff'd 210 F.2d 950 (3 Cir.1954); Weinhaus v. Gale, 237 F.2d 197, 199-200 (7 Cir.1956); McQuillan v. Nat'l Cash Register, 112 F.2d 877, 882 (4 Cir.1940), cert. den. 311 U.S. 695, 61 S.Ct. 140, 85 L.Ed. 450 (1940); de Haas v. Empire Petroleum Co., 286 F. Supp. 809, 812 (D.C. Colo. 1968), mod. on other grds. 435 F.2d 1223 (10 Cir.1970); Lawson v. Baltimore Paint & Chemical Corp., 298 F. Supp. 373, 375-376 (D.C. Md. 1969). In its determination on this issue the court emphasized the fact that the directors had transferred the Hudson agency to NJAC without compensation, even though that occurred after the litigation was instituted, thus in effect mooting NJAC's primary damage claim.
[6] The court cited Harker v. McKissock, 7 N.J. 323, reh. den. 8 N.J. 230 (1951); Higgins v. American Soc. of Clinical Pathologists, 51 N.J. 191, 202 (1968).

The court noted that pursuant to the settlement of a law suit in November 1950, at the annual membership meeting of NJAC on February 19, 1951 certain changes in the by-laws were duly adopted. The net effect of two of the changes  in Art. IX and Art. V, § 2  was to strengthen the position of, and control by, the board of directors of NJAC as against anyone who might challenge it. Defendants Peter Calcia, Floyd Hughes, Alexander Patterson, Sr. and Carleton Ritter have been members of the board of directors substantially ever since the 1951 by-laws amendments.
[7] Defendants argue that the by-law nominating procedure is not the exclusive means by which one may be elected to the board, suggesting that the court not follow In re Hamilton, 5 N.J. Misc. 660 (Sup. Ct. 1927). That case holds that where a by-law provides a procedure for nominations in advance of election, voting for a "writein" candidate is not possible. Courts in other states have refused to follow Hamilton. Commonwealth v. Markey, 325 Pa. 433, 190 A. 892 (Pa. Sup. Ct. 1937); In re Farrell, 205 App. Div. 443, 200 N.Y.S. 95 (App. Div. 1923), aff'd 236 N.Y. 603, 142 N.E. 301 (Ct. App. 1923). Whether Hamilton should be followed need not be decided. If Hamilton is to be overruled, it should be in the framework of a factual controversy involving an actual attempt to vote for someone not nominated in accordance with the by-laws, rather than in a case testing the validity of the by-law nominating procedure itself.
[8] The fact that there is no express statute giving the Superior Court authority to review elections or electoral procedures of a Title 15 corporation does not, as defendants seem to contend, preclude such jurisdiction where, as here, the case presents questions involving the rights of members of a corporation such as NJAC to nominate and vote for the members of the board of directors that manage it. See Kanengeiser v. First S. & L. Ass'n. of Jersey City, 50 N.J. Super. 427, 433 (App. Div. 1958); In re Veloso, supra. Cf. Engler v. Capital Management Corp., 112 N.J. Super. 445 (Ch. Div. 1970); Higgins, supra; Falcone v. Middlesex Cty. Med. Soc., 34 N.J. 582 (1961). See also, Lo Curto v. River Edge Girl Scout Ass'n. Inc., supra.