DAPHNE ROBERT LEEDS, ET AL., PLAINTIFFS-RESPOND-
ENTS, v. EDNA M. HARRISON, ET AL., DEFENDANTS-
APPELLANTS.

Argued February 4, 1952—Decided March 31, 1952.

203

204

*Mr. Weidner Titzck* argued the cause for appellants (*Mr. Jacob Stam*, attorney).

*Mr. James N. Butler* argued the cause for respondents (*Messrs. Moore, Butler & McGee*, attorneys).

The opinion of the court was delivered by

HEHER, J. The issue here concerns the propriety of judicial interference in the internal affairs of the defendant Young Women's Christian Association of Atlantic City, New Jersey, a body corporate organized March 13, 1915, under the Act of 1898 providing for the incorporation of "associations not for pecuniary profit." *L.* 1898, *c.* 181, *p.* 422, as amended; now *R. S.* 15:1–1 *et seq.*

The judgment directed the admission to "voting membership" in the defendant Association of the 12 individual nonmember plaintiffs "as well as all other women and girls of good character who shall make application" to the Association for such membership "and pay the dues," free of any condition or requirement that the applicants "be members of any particular Christian church or religious sect" or that they "subscribe to any statement of faith and dogma"; also, that the defendants forthwith "reorganize the corporate structure" of the Association "by abolishing the present board of directors and reducing the number of trustees to five, in accordance with the provisions" of the Association's certificate

of incorporation, and "hereafter conduct election for trustees by ballot as provided for" in the Association's constitution and by-laws, and "generally, that" the Association's constitution and by-laws "be revised and amended so as to conform to the certificate of incorporation and the provisions" of the cited statute whence came its corporate being, and that defendants refrain "from adopting a Constitution and By-laws and corporate structure contrary to the certificate of incorporation" and the cited statute.

The certificate of incorporation declared the corporate "purpose" to be "the improvement of the spiritual, intellectual, social and physical condition of young women," and provided for trustees, five in number, naming the trustees for the first year. The certificate was recorded in the office of the county clerk, but was not filed with the Secretary of State, as directed by the act. *Vide L.* 1915, *p.* 322. On January 25, 1916, a constitution and by-laws were adopted by the corporate membership. Reaffirming the "object" thus stated in the certificate of incorporation, the "purpose" of the society was therein also declared to be the association of "young women in personal loyalty to Jesus Christ as Saviour and Lord; to promote growth in Christian character and service through physical, social, mental and spiritual training and to become a social force for the extension of the Kingdom of God." It was provided that "In order to conserve the purpose of this Association, office holding and voting power shall be vested in those members of the Association who are members of Protestant Evangelical churches and thereby already committed to the fulfillment of the purpose of the organization." Later on, the constitution and by-laws were amended to provide that any woman "properly introduced or giving satisfactory reference as to character, may become a member of the Association," but that "In order to conserve the purpose of the Association" membership shall be classified as (a) "Active members, comprising those who subscribe to and will support the purpose and who are members of Protestant Evangelical churches," who "shall be

voting members known as electors," and (b) "Associates, comprising all other non-active members, who wish to identify themselves in interest and service for the Association." In January, 1929, the constitution and laws of the Association were again amended to enjoin a confession of the religious faith and beliefs made a condition of membership, in aid of the fulfillment of that requisite.

The plaintiffs comprise also six voting members and one associate member of the defendant Association. The plaintiff non-members sponsored a movement for a radical alteration in the policy and program and aspirations of the defendant Association. A campaign was undertaken to enlarge the membership. 3,000 application forms were printed and circulated. Each member of the assembled group made a pledge to obtain 25 applications for membership. The result of the concerted effort was the tender by the plaintiffs of some 247 applications for voting membership. They were advised by the executive authority of the Association that no action would be taken on the applications until a personal interview was had with the individual applicant. Meanwhile, a resolution was adopted by the plaintiff group and their associates demanding that the president and board of directors of the defendant Association "resign their offices in order that the democratic processes may be allowed to function in carrying out the purpose of the Association." In a word, the complaint was that the management of the defendant Association had deviated in policy and program from its certificate of incorporation and the statute under which it was organized, particularly in regard to the requirement of affiliation with a Protestant Evangelical church as a *sine qua non* of membership in the Association. Voting memberships were denied the plaintiff applicants, but associate memberships were tendered and refused. These were the grounds assigned for the action taken: Three were denied admission for want of affiliation with a Protestant Evangelical church or belief in the doctrine and dogma of evangelical Protestantism—one was a Unitarian, another a Hicksite Friend,

and the third did not "believe in the Protestant Evangelical position," but "was definitely against it," and had joined in the demand for the resignation of the president and board of directors of the defendant Association because she was out of sympathy with the basic principle which united the organization. All were refused voting membership for one or more of the following reasons: (a) their demand for the resignation of the directors and officers of the defendant association, before the making of their applications for membership, in order to work a fundamental change of policy responsive to "democratic processes"; (b) their public avowal of a purpose to alter the long-established policy and program of the association; and (c) because in some cases the applicants had not been "properly introduced," and all were out of sympathy with the aims and purposes of the Association and would not constitute "an efficient working force of the Association as a whole, in harmony with the purpose" declared in the charter, constitution and by-laws of the Association. The contention is that the denial of voting membership on the stated grounds is well-founded in the law. It is not open to doubt that the policies thus challenged by the plaintiffs are in accord with the greatly predominant sentiment of the present membership of the Association.

In 1920, the defendant Association joined a national federation of like bodies devoted to the same Christian philosophy and beliefs who also limited voting membership and office holding to women who were members of Protestant Evangelical churches. But on March 2, 1949, it disaffiliated from the national organization because that union and some of its individual component associates had departed from the principles and beliefs which had brought it into being and to which the defendant association gave allegiance. Associate membership, and through it the facilities and services of the defendant Association, are open to all, believer and unbeliever in the religious beliefs and principles thus espoused. The limitations upon voting membership are designed to

conserve the essential character of the Association as delineated in the certificate of incorporation and its constitution and laws.

The Superior Court found that plaintiffs were excluded from membership in the defendant association "primarily because they held Christian Protestant beliefs different from defendants, not because they were not in harmony with the objects of the YWCA as expressed in the certificate of incorporation"; and that "A by-law prescribing a religious qualification for membership" cannot be sustained because "the articles of incorporation * * * are silent on the subject." The reasoning is that under *R. S.* 15:1–2, such a restriction is effective only if embodied in the certificate of incorporation, and the particular membership qualification of adherence to evangelical Protestantism embodied in the constitution and by-laws of the defendant society "is violative of and inconsistent with the statute and certificate of incorporation, and is therefore a nullity." We take a different view.

There can be no doubt that at the outset the defendant society was constituted of persons associated together as adherents to Protestant Evangelical principles and beliefs. But it is said that the limitation of membership to disciples of the Protestant Evangelical tenets and dogma serves an essentially sectarian and denominational design foreign to the basic purposes of the Association delineated in the charter, and therefore *ultra vires* and void. Evangelical faith signifies full acceptance of the Gospel. The standards of doctrine of Protestant evangelicalism are embodied in the Apostles' Creed and the Gospels. We have been referred to the dictionary for the terms of classification and the definitive characteristics and differences. "Evangel" means the message or news of the Christian dispensation and the redemption of mankind through Christ as revelation of the grace of God; hence, one of the four Gospels. "Evangelicalism" signifies belief in the Divinity of Christ and conformance to the spirit of the Gospel and the teachings of the New

Testament—a school among the Protestants which holds that the essence of the Gospel consists mainly in its doctrines of man's sinful condition and need of salvation, the revelation of God's grace in Christ, the necessity of spiritual renovation, and participation in the experience of redemption through faith. See "evangel" and "evangelical" in *Webster's New International Dictionary, 2d ed.* Evangelical belief includes acceptance of the mystery of the Holy Trinity; hence, it differs fundamentally from the Unitarian theology which rejects the Trinity and holds that God exists only in one person, and also sustains the right of private judgment in theological matters. Thus, a by-law conditioning membership upon adherence to the articles of Christian faith expressed in the Apostles' Creed and the doctrines of the four Gospels would be in keeping with the essential object of the society. The very name assumed by the Association and the declaration of purpose made in the corporate charter plainly import an alliance of believers in the Trinity and the Divinity and teachings of Christ to serve the spiritual, temporal and social welfare of womankind. "Spiritual" has reference to the soul and the Divine Will and sacred things. It follows that the provision of the constitution limiting the voting membership to professing believers in the Christian faith, doctrine, worship and discipline comprehended in and practiced by evangelical Protestantism does not involve a radical and unauthorized deviation from the corporate charter of the defendant society. That is within and not beyond the granted power.

■■■■ Corporate powers have their origin in a sovereign grant. Generally, they are derived from the articles of incorporation and the laws of the state under which the corporate body came into being. A corporation has those powers which are implicit in the charter as well as those which are expressed. Authority not reasonably within the corporate grant is excluded. But whatever may be fairly deemed an incident of the power expressly conferred by the charter is within the grant unless expressly prohibited. The

instrument is to receive a reasonable construction to serve the general end in view. *State, New Jersey R. R. and Trans. Co. v. Hancock,* 35 *N. J. L.* 537 (*E. & A.* 1871); *Ellerman v. Chicago Junction Railways and Union Stockyards Co.,* 49 *N. J. Eq.* 217, 241 (*Ch.* 1891); *Helfman v. American Light & Traction Co.,* 121 *N. J. Eq.* 1, 19 (*Ch.* 1936). There is no distinction in this regard between nonprofit and business corporations.

█ It is conceded that the doctrinal qualification for membership prescribed by the by-laws would be effective were the charter itself but expressive of the selfsame standard. Section 2 of the cited Non-Profit Corporation Act of 1898 ordained that the certificate of incorporation "may at the option of the incorporators contain provisions prescribing the qualification of officers and members whereby they may be required to be members in good standing" of "any fraternal, religious or beneficiary order or society," and so on, "or have other prescribed qualifications, which provisions shall be binding on the members and officers. * * *." *L.* 1898, *pp.* 422, 423; *Comp. Stat.* 1910, *pp.* 125, 126. The essence of this provision is incorporated in the 1937 revision of the statutes. *R. S.* 15:1–2. The argument is that qualifications for officers and members may be imposed only by the charter. But this is a *non sequitur.* The use of the charter for this course is permissive and not mandatory or wholly exclusive. The non-inclusion of such qualifications in the charter itself does not preclude corporate action to that end. It was patently not the legislative design thus to disable the corporate body from spiritual, moral and ethical pursuits in keeping with the law, and to condition membership accordingly. Only by an amendment of the charter could the qualifications for officers and members therein laid down be modified; but, absent such provision in the charter itself, the corporate body is vested with the reserve power to prescribe, and from time to time change, the qualifications of both officers and members, consistent with its basic powers. Such is indubitably the legislative design. The statutory provision is

not couched in exclusive terms. Section 3 of the cited Non-Profit Act of 1898 endowed the corporate bodies created under. its provisions with power, *inter alia,* "To make by-laws, not inconsistent with the laws of the state or of the United States, for the management of its property and the regulation of its affairs." *L.* 1898, *pp.* 422, 423; now *R. S.* 15:1–4.

"May" is a permissive and not an imperative verb which is to be given its natural and ordinary meaning, barring a clear contextual indication of a different usage. The question is essentially one of legislative intent, to be gathered from the nature and object of the statute considered as a whole; and in that inquiry public and individual rights are sometimes factors to be regarded. *Seiple v. Borough of Elizabeth,* 27 *N. J. L.* 407 (*Sup. Ct.* 1859); *Haythorne v. Van Keuren & Son,* 79 *N. J. L.* 101 (*Sup. Ct.* 1909); *Foley v. Orange,* 91 *N. J. L.* 554 (*E. & A.* 1918); *McDonald v. Hudson County Freeholders,* 98 *N. J. L.* 386 (*Sup. Ct.* 1923); *Winne v. Cassale,* 99 *N. J. L.* 345 (*Sup. Ct.* 1924), affirmed 100 *N. J. L.* 291 (*E. & A.* 1924); *Ervolini v. Camden Co.,* 127 *N. J. L.* 473 (*Sup. Ct.* 1941). By express legislative direction, the words and phrases of the revision of the general laws adopted in 1937 are to be given "their generally accepted meaning, according to the approved usage of the language," unless "inconsistent with the manifest intent" of the lawgiver or "another or different meaning is expressly indicated"; but words of art are to be accorded their "special or accepted meaning in the law." *R. S.* 1:1–1. Here, the particular provision has affirmative relation to the manner in which the power is to be exercised, and not to the limits of the power itself, and is therefore essentially directory rather than negative and wholly exclusive. Compare *Pond v. Negus,* 3 *Mass.* 230 (*Sup. Jud.* 1807); *Skelton v. Bliss,* 7 *Ind.* 77 (*Sup. Ct.* 1855); *Bladen v. Philadelphia,* 60 *Pa.* 464 (*Sup. Ct.* 1869); *Gallup v. Smith,* 59 *Conn.* 354, 22 *A.* 334 (*Sup. Ct. of Errors,* 1890); *Dutchess County Mut. Ins. Co. v. Van Wagoner,* 132 *N. Y.* 398, 30 *N. E.* 971 (*Ct. App.* 1892);

*Groves v. Slaughter,* 15 *Pet.* 449, 10 *L. Ed.* 800 (1841). There is no implied negative that serves to render the permissive course exclusive—no ground for supposing the need of a strict mandatory construction to serve the legislative intention. The rule of *expressio unius est exclusio alterius* is in aid of the legislative intent rather than a formula to be arbitrarily applied. *Kobylarz v. Mercer,* 130 *N. J. L.* 44 (*E. & A.* 1943).

While Young Men's and Young Women's Christian Associations are not formed for public religious worship and exercise no ecclesiastical control over their members, in New Jersey such societies are deemed impressed with a "religious use" and therefore *quasi*-religious in the view of the law. The Legislature recognizes a kinship and identity between religious societies in the strict sense and associations of the particular class. There is sufficient similarity in spiritual conception for a common classification. The formation of religious societies could be had under the Non-Profit Corporation Act of 1898 as well as under the cited Act of 1875 providing for the incorporation of religious societies. *L.* 1899, *p.* 36; now *R. S.* 15:1–21.

By amendments to the Religious Societies Act of 1875, as supplemented, the Legislature authorized the incorporation of Young Men's and Young Women's Christian Associations and provided for the regulation of such societies then existing or thereafter to be incorporated under any law of the State. The acts also validated all corporations theretofore or thereafter created and organized under the Religious Societies Act "notwithstanding any provisions contained in" the cited Non-Profit Corporation Act of 1898. The "provisions" of the Religious Societies Act "with all the penalties, privileges and advantages thereof" were extended "to and for the benefit of associations known as Young Men's Christian Associations and to and for the benefit of Young Women's Christian Associations in the State of New Jersey." *L.* 1915, *c.* 149, 150, *pp.* 275, 276. These and other provisions relating to associations of this class were included in the Revision of

1937 under the general head of "Corporations and Associations, Religious." *R. S.* 16:1–1, 16:19–1 *et seq.* It is therein ordained that the provisions of *article I, chapter I* of *Title 16* (*R. S.* 16:1–1 *et seq.*) for the incorporation and regulation of "religious societies or congregations," "with all its penalties, privileges and advantages," shall be applicable to Young Men's and Young Women's Christian and Hebrew Associations in the State. *R. S.* 16:19–1.

 There is an essential and readily discernible difference between a voluntary association of persons grounded in common religious principles and beliefs for charitable and benevolent purposes and the corporation formed to govern the society's temporalities; and judicial interposition may not be had to work a basic alteration of the bond of association in disregard of the rights of those who hold membership on the faith of common adherence to the fundamental creed and polity. *III Stokes' Church and State in the United States, p.* 376. Questions of religious faith and doctrine are left to the society itself. This policy of the civil jurisdiction is founded in the constitutional freedom of religion and liberty of conscience. Generally, judicial intervention is justifiable only where the complaining parties have suffered an invasion of their civil rights, of person or of property. Compare *Commonwealth v. Woelper,* 3 *Serg. & R.* (*Pa.*) 29 (*Sup. Ct.* 1817); *Bouldin v. Alexander,* 15 *Wall.* 131, 21 *L. Ed.* 69 (1872); *Bear v. Heasley,* 98 *Mich.* 279, 57 *N. W.* 270 (*Sup. Ct.* 1893); *Philomath College v. Wyatt,* 27 *Ore.* 390, 37 *Pac.* 1022 (*Sup. Ct.* 1894); *First Presbyterian Church v. Myers,* 5 *Okla.* 809, 50 *Pac.* 70 (*Sup. Ct.* 1897); *Crenshaw v. Barbour,* 162 *Tenn.* 235, 36 *N. W. 2d* 87 (*Sup. Ct.* 1931). Such religious and *quasi*-religious societies are on the same footing as other voluntary associations for benevolent purposes: all "who unite themselves to such a body do so with an implied consent to this government, and are bound to submit to it." *Watson v. Jones,* 13 *Wall.* 679, 729, 20 *L. Ed.* 666 (1872). Such "religious societies are regarded by the civil authority as other voluntary associa-

tions, the individual members and separate bodies of which will be held to be bound by the laws, usages, customs, and principles which are accepted among them, upon the assumption that in becoming parts of such organisms they assented to be bound by those laws, usages, and customs, as so many stipulations of a contract between them." *First Presbyterian Church of Louisville v. Wilson*, 14 *Bush* 252 (*Ky. Ct. Apps.* 1878).

 The society's constitution is essentially conventional in character. The compact derives from the common consent of the parties, and is limited accordingly. It is a corollary that where, as here, there has been long acquiescence in a by-law prescribing qualifications of members, and the association is united in the principles and beliefs thereby laid down as the standard of membership, it is ordinarily not ground for judicial intervention that the by-law has unduly narrowed the field of action prescribed by the charter. *Vide Hendrickson v. Shotwell*, 1 *N. J. Eq.* 577 (*Ch.* 1832); *Miller v. English*, 21 *N. J. L.* 317 (*Sup. Ct.* 1848); *Vargo v. Vajo*, 76 *N. J. Eq.* 161 (*Ch.* 1909); *Grupe v. Rudisill*, 101 *N. J. Eq.* 145 (*Ch.* 1927); *Cameron v. International Alliance of Theatrical Stage Employees and Moving Picture Operators*, 118 *N. J. Eq.* 11, 97 *A. L. R.* 594 (*E. & A.* 1935); *Ibid.* 119 *N. J. Eq.* 577 (*E. & A.* 1937); *Harker v. McKissock*, 7 *N. J.* 323, 81 *A. 2d* 480 (1951); *Philomath College v. Wyatt, supra; Schlichter v. Keiter*, 156 *Pa.* 119, 27 *A.* 45 (*Sup. Ct.* 1893). There is no reason in law or in equity why this fundamental limitation on the character and object of the society declared at the outset by its constitution and laws should now be overthrown for want merely of a specification in the charter of the qualification of members. A subversion of the principle uniting the membership for common action is beyond the judicial province. The common bond which underlies the compact is secure against judicial interference. Such has been the motivating and cohesive force of this society from the beginning. And until now this fundamental tenet of the alliance has been free

from challenge. Religious and *quasi*-religious societies may adopt a constitution and laws for the regulation of their affairs, if conformable and subordinate to the charter and not repugnant to the law of the land; and they are binding upon the membership until modified or repealed in due course. *Jones v. State*, 28 *Neb.* 495, 44 *N. W.* 658 (*Sup. Ct.* 1890); *Baxter v. McDonnell*, 115 *N. Y.* 83, 49 *N. E.* 667 (*Ct. App.* 1898); *Hilton v. Roylance*, 25 *Utah* 129, 69 *Pac.* 660 (*Sup. Ct.* 1902); *Mack v. Kime*, 129 *Ga.* 1, 58 *S. E.* 184 (*Sup. Ct.* 1907); *Crenshaw v. Barbour, supra; Bear v. Heasley, supra.* And by their very nature, the right of membership is not a justiciable question. *Bouldin v. Alexander*, cited *supra*.

 The defendant association is religious, charitable and benevolent in nature. *Trustees of the Young Men's Christian Association v. Paterson*, 61 *N. J. L.* 420 (*Sup. Ct.* 1898); *Bible Readers'·Aid Society of Trenton v. Katzenbach*, 97 *N. J. Eq.* 416 (*Ch.* 1925); *Young Men's Christian Association v. Mayor, &c., City of New York*, 113 *N. Y.* 187, 21 *N. E.* 86 (*Ct. App.* 1889). A trust is public or charitable if the subject property is devoted to the accomplishment of purposes which are beneficial or may be supposed to be beneficial to the community. *Wilber v. Owens*, 2 *N. J.* 167 (1949); *Scott on Trusts, sec.* 348, 364, 368. Trusts for the advancement of religion or education or for other purposes beneficial to the community are charitable. *MacKenzie v. Trustees of Presbytery of Jersey City*, 67 *N. J. Eq.* 652 (*E. & A.* 1905); *Jones v. Watford*, 62 *N. J. Eq.* 339 (*Ch.* 1901), modified 64 *N. J. Eq.* 785 (*E. & A.* 1902); *Vineland Trust Co. v. Westendorf*, 86 *N. J. Eq.* 343 (*Ch.* 1916), affirmed 87 *N. J. Eq.* 675 (*E. & A.* 1917); *Commissioners for Special Purposes of Income Tax v. Pemsel* (1891), *A. C.* 531, 583. But the society itself is essentially a voluntary private eleemosynary institution rather than a public corporation in the strict legal sense. The use to be administered is public and charitable, but the organization and management are private. *Trustees of Dartmouth College v.*

*Woodward,* 17 *U. S.* 518, 4 *L. Ed.* 629 (1819); *Society for Propagation of the Gospel v. New Haven,* 21 *U. S.* 464, 5 *L. Ed.* 662 (1823); *Connecticut College for Women v. Calvert,* 87 *Conn.* 421, 88 *A.* 633 (*Sup. Ct. of Errors Conn.* 1913); *Rolfe & Rumford Asylum v. Lefebre,* 69 *N. H.* 238, 45 *A.* 108 (*Sup. Ct.* 1898). *Vide Zollmann's American Law of Charities, p. 329, sec. 472.* The right of membership is governed accordingly.

The governance of societies of the particular class provided by *R. S.* 16:19–1 *et seq.,* cited *supra,* is applicable to the defendant Association; and, such being.the case, there is no occasion to consider whether the amendments of 1915 to the Religious Societies Act can constitutionally embrace this defendant, if so designed.

The judgment is reversed; and the cause is remanded with direction to dismiss the complaint.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT and BURLING—4.

*For.affirmance*—Justice WACHENFELD—1.