84 N.J. Super. 441 (1964)
202 A.2d 455
BIBLE PRESBYTERIAN CHURCH OF COLLINGSWOOD, INCORPORATED, A CORPORATION OF THE STATE OF NEW JERSEY, GENERAL SYNOD OF THE BIBLE PRESBYTERIAN CHURCH, A NON-INCORPORATED SOCIETY, CARL McINTIRE, CHARLES A. BURKETT, JOHN W. MURRAY AND MATTHEW N. JOHNSON, PLAINTIFFS-APPELLANTS,
v.
HARVEY CEDARS BIBLE CONFERENCE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANT-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued April 6, 1964.
Decided July 6, 1964.
*442 Before Judges GOLDMANN, KILKENNY and COLLESTER.
Mr. W. Louis Bossle argued the cause for appellants.
Mr. James Hunter, III, argued the cause for respondent (Messrs. Archer, Greiner, Hunter & Read, attorneys).
The opinion of the court was delivered by GOLDMANN, S.J.A.D.
Plaintiffs brought an action in the Chancery Division seeking the following relief: (1) setting aside and cancelling a certificate of change of defendant's certificate of incorporation, as an act in fraud of plaintiffs and those who worship according to the doctrines and tenets of the Bible Presbyterian Church; (2) restoring defendant's corporate name to Harvey Cedars Bible Presbyterian Conference, Inc.; (3) enjoining the diversion and alienation of defendant's assets; and (4) removing from office all trustee-members of defendant on the ground that they had breached their trust with Harvey Cedars Bible Presbyterian Conference, Inc., by joining in such diversion. The basic argument *443 advanced for such relief was that defendant, by changing its certificate of incorporation, had diverted its property away from the Bible Presbyterian denomination to non-denominational purposes, thereby violating R.S. 16:1-25. After taking extensive proofs the trial court dismissed the complaint, stating,
"I cannot find from the testimony presented that there has been a change of purpose, a change of activities, a change of dedication of the functions of the defendant which in my opinion are sufficient to say that there has been a diversion of this property."

I.
Defendant Harvey Cedars Bible Conference, Inc. was incorporated in 1941 under the name of Harvey Cedars Bible Presbyterian Conference, Inc., as a non-profit corporation under R.S. 15:1-1 et seq. Plaintiffs McIntire, Burkett and Murray were among the individuals responsible for the creation of that corporation. The certification of incorporation stated that one of the purposes for which defendant was formed was the furtherance of the work of the Bible Presbyterian Church. A word about that church is in order.
In the years 1934-36 a schism developed in the Presbyterian Church in the United States of America ("Presbyterian Church USA"), now know as United Presbyterian Church. Plaintiff McIntire was directly involved in the controversy. At that time he was pastor of the Collingswood Presbyterian Church, incorporated under the General Religious Societies Act of 1875 (R.S. 16:1-1 et seq.). By 1936 the Collingswood Presbyterian Church had acquired real and personal property.
The conflict which brought about the split within Presbyterian Church USA was over a mandate which had issued forbidding a particular missionary expression. McIntire disobeyed this mandate, was charged with insubordination, tried by the judicial machinery of the Church, found guilty and suspended. The suspension was affirmed on appeal, and on *444 June 30, 1936 he was deposed from the ministry. McIntire renounced the authority of Presbyterian Church USA and continued to preach. His segment of the Collingswood congregation adopted resolutions repudiating the authority of Presbyterian Church USA over the Collingswood church. This group retained possession of the church property and resisted the efforts of loyal elements to use that property. This resulted in a Chancery action to get the property back from McIntire and to prevent its use for any purpose not consonant with the constitution, usages and customs of Presbyterian Church USA. In Kelly v. McIntire, 123 N.J. Eq. 351 (1938), Chancery granted the relief sought, directed that the property be held for those members loyal to Presbyterian Church USA, and enjoined McIntire from carrying on as minister in the Collingswood Presbyterian Church until his censures were removed and his right to be minister restored.
Out of this schism came the Bible Presbyterian Church. Synods of the denomination were held in successive years, beginning with the first in Collingswood on September 6-7, 1938.
McIntire and his adherents joined in the formation of the Bible Presbyterian Church and its organization into presbyteries and synod, along the general ecclesiastical lines of Presbyterian Church USA. With respect to property, however, a significantly different method and control were adopted. In light of what had happened in Kelly v. McIntire, the McIntire faction made certain that each individual congregation would own its own property, which would not be owned or controlled by any other ecclesiastical unit or organization. Chapter 20 of the Bible Presbyterian Church constitution provided:
"1. The General Synod, the several presbyteries and the several churches may maintain corporations to handle affairs pertaining to property and other temporal matters, which do not come properly under the jurisdiction of the courts themselves.

* * * * * * * *
4. All particular churches shall be entitled to hold, own, and enjoy their own local properties, without any right of reversion *445 whatsoever to the Bible Presbyterian Church, its presbyteries, synods, or any other courts hereafter created, its trustees or other officers.
5. The provisions of this chapter are to be construed as a solemn covenant whereby the Church as a whole undertakes never to attempt to secure possession of the property of any congregation against its will, whether or not such congregation remains within or chooses to withdraw from this body. All officers and courts of the Church are hereby prohibited from making any such attempt. The provisions of sections 4 and 5 of this chapter are unamendable and irrevocable."
Subsequent incorporations were therefore effected under the General Religious Societies Act, R.S. 16:1-1 et seq., rather than under the Presbyterian Act, R.S. 16:11-1 et seq. Further, agencies of the Bible Presbyterian Church were deliberately established as completely independent entities.
The Bible Presbyterian Church flourished and expanded from 1938 until about 1955, consisting of a loose grouping of individual autonomous congregations, each capable of withdrawing from the larger group and of taking its property with it, as provided by those sections of the constitution just quoted. As the denomination expanded, there were established various ecclesiastical functions, such as colleges, seminaries, foreign missions and homes for the aged, all on an independent basis and operating independently. From the time of its establishment in 1941 defendant was in this category of independent agencies, not subject to outside control.
It would appear that at the time of the St. Louis, Mo., and Columbus, Ohio, Synods of the Bible Presbyterian Church, held in 1955 and 1956, respectively, the delegates showed strong dissatisfaction with the methods used by McIntire and his attempt to dominate the independent agencies of the denomination. As a result, the Synod voted to pull out of the councils dominated by McIntire, among them the American Council of Christian Churches and the International Council of Christian Churches. When the Synod took this action, McIntire decided to form a denomination of his own. Instead of processing his complaints and grievances up through the judicial framework existing within the Bible Presbyterian Church he, without sanction or authority under the denomination's *446 constitution, called a "20th Synod" at Collingswood. (This Synod is the plaintiff "General Synod of the Bible Presbyterian Church," known as the "Collingswood Synod.") The regular Synod continued and is known as the "Columbus Synod," from the fact that it met in Columbus, Ohio, in the fall of 1956 when McIntire called the Synod in Collingswood. The Columbus Synod continues to be supported by a large majority of the constituent churches and presbyteries within the denomination, and maintains the apparatus of the denomination. To eliminate confusion and possible bickering with the McIntire faction, the Columbus Synod, following due ecclesiastical procedures, changed its name to Evangelical Presbyterian Church.
It is clear from the record that the dispute spread to the various independent agencies and facilities of the Bible Presbyterian Church. The McIntire faction was able to maintain control in a number of them. However, McIntire was not successful with regard to defendant Harvey Cedars, despite his faction's withdrawal of financial support and his verbal and written attack upon it. He proceeded to establish a competitive conference, the Twentieth Century Reformation Youth Conference.
As noted, defendant was incorporated in 1941 under Title 15 of the Revised Statutes, as an independent agency. Plaintiffs readily admit defendant's creation and existence as an independent entity. After its incorporation defendant acquired an old 50-room hotel property in the Borough of Harvey Cedars, located on a tiny island just off Long Beach Island, N.J. Defendant operates and maintains a conference there, with living quarters and religious, educational and recreational facilities for young people and adults. The use of these facilities was not, and is not, restricted to members of the Bible Presbyterian Church.
The acquisition of the property, and its subsequent maintenance and operation, has been made possible by contributions derived from various sources, totalling more than $617,000 in the years 1947 through 1961, as reflected by the only records *447 available. Some of these contributions admittedly came from the Collingswood Church and its members. The trial judge fixed these contributions at $34,000; defendant credits the McIntire faction with $47,078. Independent and Evangelical Presbyterian contributions totalled $157,575. The bulk of the income, as might be expected, came from operations  $412,761. The McIntire faction (Bible) group discontinued supporting defendant after August 1957; the Evangelical group has carried on as before.
The affairs of defendant Harvey Cedars were managed by a board of trustees elected pursuant to its by-laws. Plaintiff McIntire was elected to the first board and served until October 1959, at which time he failed of reelection. At that meeting a committee was appointed to call upon McIntire and two others (also not reelected) to determine their interest in defendant conference and their desire to be reelected to the board. Similarly, in March 1960, when another election was held and it was decided not to fill the three vacancies, the secretary was instructed to write the men involved informing them of the action taken and the willingness of the board to discuss the matter further with them.
Defendant's by-laws provide that "Trustees shall hold office until their successors are elected and qualified." The vacancies just referred to were not filled until after the institution of this litigation. Thus, the trial court properly found that plaintiffs McIntire and Murray, who remain in the case as plaintiffs, were still members of the board of trustees and had standing to bring this action. Defendant does not question that determination.

II.
What constitutes the crux of this litigation occurred on May 26, 1961. On that date defendant filed a certificate of change which amended its certificate of incorporation and led to plaintiffs' allegations of diversion and this suit. For purposes of comparison, the pertinent provisions of the original *448 and amended certificates of incorporation are here set forth. The original certificate provided:
"A. The name or the title by which this corporation is to be known in law is `Harvey Cedars Bible Presbyterian Conference, Inc.
B. The purposes for which it is formed are as follows:
1. To conduct regular services of religious worship according to the doctrine and tenets of the Bible Presbyterian denomination.
2. To maintain Christian Youth Conferences under the guidance of the Bible Presbyterian denomination.
3. To maintain a Home and give aid to members of the Bible Presbyterian denomination and such others as are deemed worthy and proper persons for aid and assistance, and in general to use any lands and premises owned by the association as a place for the dispensation of all manner of charity, recreation and religious education, without any pecuniary profit to the community where the lands and premises are situated, to the Bible Presbyterian denomination, or to the members of this association."
As amended pursuant to R.S. 15:1-14 and 14.1, the certificate reads:
"A. The name or title by which this corporation is to be known in law is `Harvey Cedars Bible Conference, Inc.'
B. The purposes for which this corporation is formed are as follows:
(1) To conduct regular services of religious worship under the supervision of the Trustees of this corporation.
(2) To maintain and operate Christian Bible Conferences.
(3) To maintain a Home or Homes and give aid to such persons as are deemed worthy and proper for assistance.
(4) To use the lands and premises owned by this corporation as a place for religious education and wholesome recreational activities and for the dispensation of all manner of charity.
(5) To receive, hold, care for, invest in and operate real and personal property and to use, distribute from time to time, all the income and all principal, as well, which it shall receive in charitable gifts, to be applied consistently with the by-laws of this corporation, for the benefit of an indefinite number of persons, by bringing their minds and hearts under the influence of the Christian faith, by relieving their bodies from disease or suffering and by assisting them to establish themselves in life. * * * It is the intent and purpose that this corporation shall be conducted exclusively for religious, charitable, educational and recreational purposes, * * *.

* * * * * * * *
D. * * * Each trustee, as a condition to his qualification to serve, shall annually subscribe in writing to the System of Doctrine *449 of the Westminster Confession of Faith, as Adopted by the First General Synod of the Bible Presbyterian Church in 1937.

* * * * * * * *"
Plaintiffs view these changes as constituting a breach of trust and a diversion of church property away from the Bible Presbyterian denomination, contrary to R.S. 16:1-25, part of the General Religious Societies Act, which provides:
"No * * * trustees * * * of any incorporated church, congregation or religious society of this state shall divert the estate, property or revenue belonging thereto to any purpose other than the support and maintenance of the church or religious or benevolent institution or object connected with the church or denomination to which the corporation belongs. * * *"
The trial judge did not find it necessary to decide which of the opposing groups is the secessionist and which the fundamentalist. In passing he noted that aside from certain doctrinal changes, both apparently continued to adhere to what is broadly termed "Bible Presbyterian Tenets." He found that defendant was an independent organization, free from the control or government of any of the religious bodies connected with this matter  this because of its incorporation under the Non-Profit Corporations Act, R.S. 15:1-1 et seq., and because of the position taken by the Bible Presbyterian Church in its own constitution, that property owned by an individual church belonged to that church and was beyond the control of any presbytery or synod.
Turning then, to the basic issue, the trial judge found no proof that the activities conducted by defendant after the split-up were not of a religious nature or any different than they had been prior thereto. As noted in our earlier quotation from his oral conclusions, he found no change of purpose, activities or dedication sufficient to say that there had been a diversion of property, and so dismissed the complaint.

III.
Plaintiffs assert that defendant is a religious society, and therefore subject to the laws relating to such societies, particularly *450 R.S. 16:1-25, from which we have quoted and which forbids the diversion of property "to any purpose other than the support and maintenance of the church or religious or benevolent institution or object connected with the church or denomination to which the corporation belongs." They cite Leeds v. Harrison, 9 N.J. 202 (1952), in support.
R.S. 15:1-21 gives religious societies the choice of incorporating under either Title 15 or Title 16 of the Revised Statutes. Defendant chose to incorporate under Title 15, which contains no provision corresponding to R.S. 16:1-25.
We do not consider Leeds v. Harrison as supporting plaintiffs' argument that the General Religious Societies Act, R.S. 16:1-1 et seq., applies to this case. Leeds dealt with the rights of certain applicants to membership in the Y.W.C.A., rather than the powers of trustee-members. It did hold that although the Y.W.C.A. was incorporated under the Non-Profit Corporations Act, R.S. 15:1-1 et seq., certain provisions of the General Religious Societies Act, R.S. 16:1-1 et seq., were applicable, and this as specifically provided in R.S. 16:19-1. The latter states that R.S. 16:1-1 et seq. shall be applicable to Young Women's Christian Associations. There is no such specific provision available to plaintiffs in the present case.
It should also be observed that the Leeds court held (9 N.J., at page 214), conformable to R.S. 15:1-21, just mentioned, that religious societies may incorporate either under the Non-Profit Corporations Act or the General Religious Societies Act. Defendant chose the former. Since corporate powers of non-profit corporations are derived from their articles of incorporation and the law under which the corporation came into being, Leeds v. Harrison, above, at page 211, the actions of the defendant's board of trustees should be measured by the standards set in R.S. 15:1-1 et seq. We find no provision under Title 15 which would prevent defendant, after proper action of its members, from altering its stated purposes. Indeed, N.J.S.A. 15:1-14 expressly provides for such changes. We therefore hold that *451 R.S. 16:1-25 is not applicable to defendant, a Title 15 corporation.

IV.
Beyond and above all this, we are satisfied that plaintiffs failed to prove that there had been any significant alteration in defendant's purposes. At this juncture it is appropriate to refer once more to plaintiffs' concession that defendant was never subjected to the control of the Bible Presbyterian Church. Therefore, whether defendant's purposes have been altered must be tested by comparing its present activities with its original purposes.
Plaintiffs' allegation of diversion rests exclusively upon the effect of the changes in defendant's certificate of incorporation. Like the trial judge, we find no evidence to support any claim which might be made that the practices at Harvey Cedars have changed.
We do not view the change from the name "Harvey Cedars Bible Presbyterian Conference, Inc." to "Harvey Cedars Bible Conference, Inc." as significant or as proof of diversion. The conduct of regular religious services, the maintenance of Christian Youth Bible Conferences, and the maintenance of a home or homes to give aid to worthy and proper persons, still remain among defendant's prime purposes. The amended certificate, paragraph B(5), states that "It is the intent and purpose that this corporation shall be conducted for religious, charitable, educational and recreational purposes." Of critical significance is the fact that under the amended charter the trustees remain obligated, as a condition of service, to "annually subscribe in writing to the System of Doctrine of the Westminster Confession of Faith, as Adopted by the First General Synod of the Bible Presbyterian Church in 1937." Thus, continuity of basic doctrine is as assured as it can possibly be, through the subscription of the ruling body to the tenets common to both the Bible and Evangelical Presbyterian denominations.
*452 In short, plaintiffs have not shown that the Evangelical group  in particular, defendant  has veered from the teachings of the Bible Presbyterian faith, either through statements or actions. Absent such proof, we are of the opinion that the case was properly decided at the trial level.
The judgment is affirmed.