595 A.2d 1132

STATE IN THE INTEREST OF B.J.W., A JUVENILE.

Superior Court of New Jersey
Chancery Division Family Part
Hunterdon County

February 25, 1991.

---

*Steven Lapedis,* attorney for movant Times of Trenton Publishing Company.

*Steven C. Lember,* First Assistant Prosecutor, Hunterdon County.

*Nicholas DiChiara,* for Office of the Public Defender.

HERR, J.S.C.

This matter was opened to the Court by the attorneys for the Times of Trenton Publishing Corporation ("Times"), publisher of the TIMES, a daily newspaper with circulation in central and southern New Jersey, including Hunterdon County. The Times seeks an order permitting it to attend all court proceedings in this matter, pursuant to *N.J.S.A.* 2A:4A–60(g) and *R.* 5:19–2(a). The motion is opposed by counsel for the juvenile. The Hunterdon County Prosecutor's Office advises that the State of New Jersey neither joins in nor opposes the application but submits to the Court's discretion.

B.J.W., who was born January 20, 1975, is charged with committing two crimes which if perpetrated by an adult would be murder. The victims were her mother and her brother, who were killed on November 8, 1990, when B.J.W. was age 15. The Times submitted a certification with eight newspaper articles attached, several of which had bold headlines in letters exceeding one-half inch, and beginning on November 9, 1990, with one from the TRENTONIAN stating, "Girl, 15, held in stabbing, bludgeoning mom, brother." The articles include the name of this juvenile and her picture, apparently obtained from

school records, and several acquaintances of this juvenile and her family are quoted.

The most recent article supplied was dated November 28, 1990, wherein juvenile friends were depicted as keeping a "vigil" for B.J.W. The Times argues that this is already a highly-publicized case, that it is of great community concern, and that media access will not only promote the free press guarantees of the First Amendment to the United States and New Jersey Constitutions but "will eliminate unnecessary speculation, conjecture and rumor and promote public confidence in the juvenile justice system."

Furthermore, the Times argues that *N.J.S.A.* 2A:4A–60(g) and *R.* 5:19–2(a) require public access because no specific harm to the juvenile can be demonstrated.

The Times is correct in stating that the standard to be followed in deciding this application is *N.J.S.A.* 2A:4A–60, which is entitled "Disclosure of juvenile information; penalties for disclosure." The basic premise of this statute is set forth in Paragraph (a). The first sentence of Paragraph (a) states:

Social, medical, psychological, legal and other records of the court and probation department, and records of law enforcement agencies, pertaining to juveniles charged as a delinquent or found to be part of a juvenile-family crisis, shall be strictly safeguarded from public inspection.

Thereafter follow several specific exceptions to the above-stated basic premise of non-disclosure. The application of the Times fits under subparagraph (g), which states:

The court may, upon application by the juvenile or his parent or guardian, the prosecutor or any other interested party, including the victim or complainant or members of the news media, permit public attendance during any court proceeding at a delinquency case, where it determines that a substantial likelihood that specific harm to the juvenile would not result.

There is no application by any of the possible applicants listed in the statute except the application by this one member of the news media. From a reading of the statute, I conclude that if I determine there is a substantial likelihood of specific harm for the juvenile, I have no discretion: I must prohibit public attendance.

On the other hand, even were I to determine that it is likely no specific harm to the juvenile would result from public attendance, I am satisfied the legislature still intended that the Court exercise its discretion whether to admit or deny the public. I reach this conclusion because the statute begins with the phrase, "The court may...."

The word "may" has consistently been interpreted in statutory and case law to grant discretion to do an act or to refrain from doing an act. *Leeds v. Harrison*, 9 *N.J.* 202, 87 *A.*2d 713 (1952). Had the statute read, "The court shall ... permit public attendance ... where it determines that a substantial likelihood that specific harm to the juvenile would not result," I would have no judicial discretion once I found a substantial likelihood that specific harm to the juvenile would not result: I would be required to permit public attendance. However, as I stated, the statute uses the term "may," and I have determined that the Court's discretion in this case should be exercised to deny the application of the Times.

To the extent that an unpublished opinion presented by the applicant differs from my conclusion that the word "may" in the statute negates any suggestion of a "presumption in favor of publicity," suffice it to say that a divergence of views between and among judges of equal rank respecting matters of law is not unknown. No controlling appellate decision, published or unpublished, has been brought to my attention which would effectively disparage my view, nor do the facts herein support a need to protect the public by free access as was perceived to be necessary in the unpublished opinion. To the contrary, I am satisfied for reasons which appear hereafter that it is the juvenile who needs protection.

Herein, the juvenile opposition to the application is supported by the testimony of Edward J. Dougherty, Ph.Ed., a New Jersey licensed psychologist who was cross-examined by the applicant and whose expert opinion that public access is con-

traindicated is given considerable weight for reasons hereafter stated.

Dr. Dougherty founded Greenbrook Academy 11 years ago and remains its director. Greenbrook is a school for seriously emotionally disturbed young people between the ages of 11 and 21 years. It is State approved and serves the youth of 33 school districts in central New Jersey. He devotes 80 percent of his professional time to children. He is an assistant professor at St. John's University and continues post-doctoral studies and acts as a guest lecturer to a variety of professional organizations.

He first met with B.J.W. on November 9, 1990, and has spent 22½ hours with her through the period ending February 2, 1991. He administered eight tests of his own and was present for part of the examination done by William J. Annitto, M.D., who has made treatment recommendations on behalf of the juvenile. Dr. Dougherty gave his opinion that B.J.W. suffers two pre-existing disorders, that is, disorders which pre-existed the November 8, 1990, incident. First, she has severe depression disorder going back to approximately seventh grade, as determined by interviews he had with family members, her school records and her minister. This disorder had never been treated prior to November 1990. He also ascertained that she has a post-traumatic stress disorder which results in flashbacks and withdrawal to a fantasy world to avoid the earlier bad memories, as well as memories of the November 8 incident.

The testimony at subsequent hearings on this matter will include confidential psychological and psychiatric information not only about the juvenile, but also about her family members, both living and deceased. While one could argue that the dead cannot be injured, one can hardly ignore the impact of such testimony on the juvenile's 22–year–old brother who lives in this community.

The fact is that while the public has a curiosity about the family in which a teenage member is accused of such incompre-

hensible violence within the family, there is not the same concern here as exists when an unrelated member of the public is the victim of a juvenile crime. Therein I recognize the need to inform the public so that it might be aided in its own protection. The neighborhood has not been represented herein as in a state of panic, nor is the public likely to look on this case as one where the juvenile justice system must demonstrate an ability to protect the public.

This is, most of all, a family tragedy involving five members of an immediate family. Only three of those members survive: this juvenile and her father and brother. Dr. Dougherty has described this family's history as dysfunctional but stated the father and brother are now coming to the support of the juvenile and she is bonding with them. He opines that it is critical that she maintain this bonding to meet and overcome her psychological disorders. It will be difficult for her to learn to face these disorders. The publicity from public hearings, he states, will undermine her confidence in her psychologist and will inhibit the family bonding and her present therapeutic program. He also opines that it will impact on her rehabilitation and it may even impact on her ability to deal with future court proceedings, but I do not infer from this comment that she would not be able to assist her counsel in her defense. Also, the pre-existing dysfunctional family opinion is supported by reports that this juvenile made two suicide attempts in close proximity to but prior to the November 8, 1990, incident. Dr. Dougherty also reported that he witnessed the regression of this juvenile in addressing her disorders on one occasion where she became aware of the publicity surrounding this case. I find that the conclusions of Dr. Dougherty are predicated on facts established on this record and are rationally reached from those facts.

Thus, it does not appear to be the number of extra people who may be in the courtroom that will impact the juvenile if the public is admitted. That can be controlled. It is, rather, the likely boldly-headlined newspaper accounts of the intimate de-

tails of this family that will impact not only the juvenile, but her other surviving family members.

The specific harm to the juvenile that seems likely to occur is the destruction of her bonding to her father and brother and the destruction or delay of her ability to address her disorders. Both of these negative impacts would result from sharing with the public the confidences first revealed in the psychologist-patient relationship. But even were these found not to be specific harms, I conclude I still have the discretion to deny public access.

This is a family one can only describe as already devastated by tragedy. As a Judge of the Family Part, a court created by constitutional amendment to be uniquely qualified to address family issues, not individuals without regard to their families, I conclude public attendance at the hearings in this case, so long as they remain in the Family Part, will not be permitted.